[Cite as *State v. Secessions*, 196 Ohio App.3d 741, 2011-Ohio-6066.]

STATE OF OHIO      )
                    )ss:
COUNTY OF SUMMIT    )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

THE STATE OF OHIO,

    Appellee,

    v.

SECESSIONS,

    Appellant.

C.A. No.     25754

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 10 04 1055 (A)

DECISION AND JOURNAL ENTRY

Dated: November 23, 2011

APPEARANCES:

    Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Heaven DiMartino, Assistant Prosecuting Attorney, for appellee.

    J. Reid Yoder, for appellant.

DICKINSON, Judge.

INTRODUCTION

{¶1}    After leaving her job for the night, Malissa Smith-Cage drove her coworker Dedosha Smith, Smith's boyfriend Timothy Secessions, and Secessions's friend Gordon Mosley to an after-hours bar. At the bar, Smith told Smith-Cage that she had lost some money in Smith-Cage's car, so Smith-Cage helped her look for it. As Smith-Cage was looking under the driver's seat, Secessions allegedly grabbed her neck from behind and demanded her money. The grand jury indicted Secessions for aggravated

robbery and robbery. A jury found him guilty of robbery, and the trial court sentenced him to eight years in prison. Secessions has appealed, assigning as error that the trial court incorrectly failed to declare a mistrial, that the state willfully failed to disclose evidence, that his conviction is not supported by sufficient evidence, and that the jury's verdict was against the manifest weight of the evidence. We affirm because Secessions has not established that the trial court committed plain error when it did not declare a mistrial sua sponte, that the undisclosed evidence prejudiced his defense, that his conviction is not supported by sufficient evidence, or that the jury's verdict was against the manifest weight of the evidence.

FACTS

{¶2} Smith-Cage testified that she was working at a club on the evening of April 10, 2010, when Smith asked if Smith-Cage could give her a ride after they were finished. Smith-Cage agreed to take Smith because she thought she just needed a ride home and it would not be out of her way. When the time came to go, Smith asked Smith-Cage if she could take Secessions and Mosley too because the men had been waiting for her. Smith-Cage eventually agreed.

{¶3} Smith-Cage testified that she did not know exactly where Smith wanted to go so she followed her instructions as she drove. At some point they stopped for gas. She testified that Smith guided her to an after-hours bar and asked her to drop them off. By then, Smith-Cage had to use the bathroom, so she got out of the car with the others and walked to the building. As she got near the door, she felt uncomfortable, so she decided to return to her car. Before she could leave, Smith stopped her and told her

that she thought she had dropped some money in the car. Smith-Cage, therefore, helped Smith look for the money.

{¶4} According to Smith-Cage, she looked in the front of the car, then got out to move the driver's seat forward. As she was looking under the seat, Secessions suddenly grabbed her neck from behind and started choking her. He pushed her into the back of the car, grabbed her keys from her hand, and continued choking her. Smith, meanwhile, got in the front passenger seat and began going through the car's glove box and console, looking for money and encouraging Secessions. Because Secessions had his hands around her neck, Smith-Cage could not speak, but she pulled her shirt down to show him that she had money tucked inside her bra. Secessions grabbed the money and left. From the back of the car, Smith-Cage reached for her cellular phone, which was in the center console, and got into a struggle with Smith, who had seen her reaching for it. Smith-Cage testified that she won the struggle, that Smith fled the car, and that she then called 9-1-1.

{¶5} Smith told an entirely different story. She testified that as Smith-Cage was turning into the after-hours parking lot, she turned too sharply and almost drove into a ditch. The car's sudden stop tipped her purse over and spilled its contents on the floor. Smith tried to pick everything up, but, apparently, did not see the money. She testified that after Smith-Cage parked the car, the four of them entered the after-hours bar and ordered drinks. When she tried to pay for her drink, however, she noticed that her money was missing and told Smith-Cage that it must be in the car. Smith-Cage and she went out to the car to look for it, with Smith going to the passenger's side and Smith-Cage going to the driver's side.

{¶6} Smith testified that before she could look in the car, she noticed that her food-assistance-benefits card was on the ground next to it. She picked up the card and turned to start looking in the car when she saw Smith-Cage pick up her money and put it in her bra. Smith-Cage would not give the money back, so she started arguing with her. At some point, Secessions exited the after-hours bar, learned what had happened, and confronted Smith-Cage. When Smith-Cage got too close to him, Secessions grabbed her by the neck and shoved her to the ground. At that point, Smith convinced Secessions to leave with her, deciding she could bring the issue up again the next time she saw Smith-Cage at work. She reentered the after-hours bar, Secessions paid for their drinks, and then she, Secessions, and Mosley walked together to their houses, which were only a few blocks away. As they were leaving, Smith-Cage threw her keys at them and hit Secessions, so Smith picked up the keys and threw them in a field.

{¶7} Mosley testified that everyone entered the after-hours bar together and ordered drinks. At some point the others got up and went outside, so he followed them. When he got outside, he saw Smith-Cage "brushing up" on Secessions, "talking about mak[ing] something right." Secessions pushed Smith-Cage to get her off him. Smith, Secessions, and he went back inside the after-hours bar, paid for their drinks, and then walked home. He did not hear everything that the others were talking about outside, but thought it was about lost money.

{¶8} Police officer Brent Heller testified that he was the first one to arrive after Smith-Cage called 9-1-1. He said it was difficult to talk to Smith-Cage because "she was crying, holding her throat, trying to breathe; she's wheezing, you know, gasping for air." Smith-Cage told him, however, that Secessions had choked her and had taken her

keys out of the car's ignition. He said that because her skin tone is dark, he could not see any discoloration, but could tell that "her neck was a little puffy." He also testified that it looked like the stuff in her car had been gone through, with everything that had been in the glove box thrown onto the front passenger's seat.

{¶9} Paramedic Brian Dusseau testified that he examined Smith-Cage outside the after-hours bar. He said that she told him she had been choked with two hands for a minute and complained of neck pain. Her pulse was 120. Although he did not see any external injuries, he testified that it can take some time for bruises to appear. He also said that he recommended to Smith-Cage that she go to the hospital for further evaluation.

{¶10} Detective John Ross testified that he spoke to Smith-Cage while she was waiting to see a doctor at the hospital and saw ligature marks across her throat. He took a statement from her, then drove her home because she wanted to go home more than wait to see a doctor. He returned to her house later that day to ask Smith-Cage additional questions and take pictures of her neck. He also testified that the police had to tow her car because they were concerned Secessions might return to the parking lot and take it.

{¶11} The grand jury indicted Secessions and Smith for aggravated robbery and robbery, and they were tried together to a jury. At the conclusion of the state's case, the trial court granted the defendants' motions for directed verdict on the aggravated-robbery charges. The jury found Secessions guilty of robbery, and the trial court sentenced him to eight years in prison. He has appealed his conviction, assigning four errors.

## MISTRIAL

{¶12} Secessions's first assignment of error is that the court should have declared a mistrial because the limiting instruction it gave regarding inadmissible hearsay testimony by Smith-Cage was not sufficient to cure the prejudicial effect of the testimony. Smith-Cage testified that after Secessions and Smith were indicted, Smith's brother came to her workplace "to offer me money not to come to court." The defendants objected, the trial court granted their motion to strike, and the court instructed the jury to "disregard" and "ignore" Smith-Cage's answer. Secessions has argued that Smith-Cage's statement was so inflammatory that the court's instruction was insufficient to cure the prejudice it may have aroused against him in the minds of the jury.

{¶13} The Ohio Supreme Court has held that " '[a]ttempts by persons other than the accused to bribe witnesses * * * are evidence against the accused when, but only when, it is proven that he was connected with such attempts. Acts and statements of third persons, not known or authorized by him, are inadmissible.' " *State v. Smith*, 49 Ohio St.3d 137, 143 (1990), quoting *State v. Walker*, 55 Ohio St.2d 208, 215 (1978). In this case, there was no evidence that Secessions or Smith was connected with Smith's brother's attempt to bribe Smith-Cage. The trial court, therefore, correctly struck Smith-Cage's testimony and instructed the jury to ignore it.

{¶14} The next question is whether the trial court should not only have struck Smith-Cage's testimony, but also should have declared a mistrial. "It is well settled that a trial court may grant a mistrial sua sponte or on motion by the parties when 'there is a manifest necessity for the act, or the ends of public justice would otherwise be

defeated.' " *State v. Herrington*, 9th Dist. No. 25150, 2010-Ohio-6455, at ¶ 36, quoting *Cleveland v. Walters*, 98 Ohio App. 3d 165, 168 (1994). We note that neither Secessions's nor Smith's lawyers asked the court to declare a mistrial. Accordingly, we review its failure to declare a mistrial for plain error. *Id.* Plain errors must be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97 (1978).

{¶15} There are no exact standards to apply in evaluating whether a trial court should declare a mistrial in a particular case. *State v. Plant*, 9th Dist. No. 2599, 1991 WL 81650, at *2 (May 15, 1991). "Instead, the law grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *Id.* According to the Ohio Supreme Court, " 'the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.' " *State v. Widner*, 68 Ohio St.2d 188, 190 (1981), quoting *United States v. Perez*, 22 U.S. 579, 580 (1824).

{¶16} Secessions has argued that his case is similar to *State v. Talbert*, 33 Ohio App.3d 282 (1986). In that case, Chester Matthews hired attorney Bonford Talbert to represent him in an eviction action. When Talbert visited the apartment complex's

rental manager, he allegedly kissed her and attempted to put his hand on her breast. To obtain corroborating evidence, the police arranged a telephone call between the rental manager and Talbert. Talbert was charged with sexual imposition based on the statements he made during their conversation.

{¶17} At trial, the rental manager testified that Talbert, a former municipal-court judge, told her that he "would pay anybody off to do anything for him in court." *Talbert* at 285. Talbert's lawyer did not object, but the trial court found the testimony so inflammatory that it stopped the trial to admonish the jury to disregard it. Talbert's lawyer then moved for a mistrial, but the trial court denied the motion after it polled the jury to determine whether it could ignore the statement when considering the merits of the case.

{¶18} The Third District Court of Appeals concluded that even though Talbert's lawyer did not initially object to the rental manager's statement, under the circumstances of the case, the declaration of a mistrial was the "only alternative to meet the ends of justice." *Talbert*, 33 Ohio App.3d at 286. It explained that although the jurors said they could ignore the remark, "[t]he fact remains that a former municipal court judge from their own city, one well associated with the inner workings of the very court in which he was on trial, had been accused of being able to obtain a favorable verdict through bribery." *Id.* Denying that it was giving Talbert special consideration, the court reasoned that "the trial of a former official under these circumstances is inherently fraught with the possibility of error." *Id.* "Whereas the nature of the statements complained of would be severe in *any* case, the prejudicial implication is clearly heightened in this case. Ultimately, if the public is to have the security in the

faithful, sound, and conscientious exercise of justice within the judicial system, all parties must have the promise of a trial free of the unwarranted taint of partiality among the jurors. Absent such a promise, the accused is denied a valued right and the public's interest in fair trials may be subordinated." *Id.*

{¶19} The alleged bribery attempt in this case does not involve a former judge or raise inherent questions about the integrity of the court system. It also does not involve a bribery attempt by Secessions himself, but a family member of a co-defendant. Unlike in *Talbert*, Smith-Cage's single statement about Smith's brother's actions was not so inflammatory regarding Secessions's case to overcome the presumption that the jury followed the trial court's curative instructions. *State v. Garner*, 74 Ohio St. 3d 49, 59 (1995) ("A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge"). We conclude that Secessions has not demonstrated that his case involves such exceptional circumstances that the trial court's failure to sua sponte declare a mistrial resulted in a miscarriage of justice. See *State v. Smith*, 49 Ohio St. 3d 137, 144 (1990) (concluding that "relatively short reference made to the jury regarding [a] bribe attempt was harmless beyond a reasonable doubt"). Secessions's first assignment of error is overruled.

## DISCOVERY

{¶20} Secessions's second assignment of error is that the prosecution willfully failed to disclose evidence that it was required to produce under Crim.R. 16, substantially prejudicing his defense. He has argued that the state failed to tell him that Smith-Cage told a prosecutor that Smith's brother and the mother of Secessions's children had offered her money not to testify.

{¶21} After Smith-Cage testified about Smith's brother's bribery attempt and Smith's lawyer objected, the trial court held a sidebar. The prosecutor explained that she had been talking with Smith-Cage the previous day when Smith-Cage told her about the attempted bribe. The prosecutor revealed that Smith-Cage also told her that the mother of Secessions's children had attempted to offer her money not to testify, but said that she had not planned on asking Smith-Cage about that conversation. Secessions's lawyer told the court that the prosecutor had not told him about either of the alleged bribery attempts.

{¶22} Under Crim.R. 16(B)(7), upon written demand, the prosecution must provide a defendant with "[a]ny written or recorded statement by a witness in the state's case-in-chief." While the rule mentions only written or recorded statements, the Ohio Supreme Court has held that the state must also disclose oral statements, even though they "may have not been actually reduced to a written summary." *State v. Parson*, 6 Ohio St.3d 442, 445 (1983); *State v. Logan*, 9th Dist. No. 18958, 1998 WL 668187, at *2 (Sept. 30, 1998). "Prosecutorial violations of Crim.R. 16 are reversible only [if] there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995).

{¶23} Secessions has argued that the prosecutor's question to Smith-Cage and her statements at sidebar demonstrate that she knew about the bribery attempts before trial and willfully violated the discovery rule. He has also argued that if he had known about Smith-Cage's allegations earlier, he could have used them to attack her credibility

or called Smith's brother to contradict her. He has further argued that even though the trial court struck Smith-Cage's answer and gave a curative instruction, the instruction was insufficient to cure the testimony's prejudicial effect.

{¶24} Secessions's trial began on December 6, 2010, but Smith-Cage did not testify until the next day. During the sidebar, the prosecutor said that Smith-Cage told her about the bribery attempts "yesterday," that is, the day trial began. Accordingly, there is nothing in the record to suggest that the prosecution knew about Smith-Cage's allegations before trial. Of course, upon learning about Smith-Cage's allegations, the prosecutor should have told the defendants about them, even though the trial had already begun.

{¶25} Regarding whether Secessions suffered any prejudice from not learning about Smith-Cage's accusations a day earlier, we note that during the sidebar, Smith's lawyer told the court that Smith-Cage's testimony had put them "in a position where we have to bring someone in to rebut this and if the State is going to go ahead * * * with the line of questioning, surely the Court has to permit us to bring in witnesses who would rebut anything about this statement." The court replied: "I don't see a problem with that." When the prosecutor explained that she did not have any further questions on the subject, Smith's lawyer declared that "[w]e may not touch it if that's all th[ere] is." Secessions's lawyer did not say anything about the issue at that point, but later "join[ed]" Smith's lawyer's argument "[t]o avoid duplication."

{¶26} After learning about Smith-Cage's allegations, Secessions did not move for additional time to prepare his cross-examination or to locate Smith's brother. Accordingly, he has not established that he would have altered his defense strategy if

he had learned about the allegations earlier. Because Secessions has not demonstrated that "foreknowledge of the information would have benefited [him] in the preparation of his defense," we conclude that the prosecutor's failure to tell him about Smith-Cage's allegations was not prejudicial. *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995). Secessions's second assignment of error is overruled.

ROBBERY

**{¶27}** Secessions's third assignment of error is that the evidence presented at trial was insufficient to support his conviction for robbery. Whether a conviction is supported by sufficient evidence is a question of law that this court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. West*, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶ 33. We must determine whether, viewing the evidence in a light most favorable to the prosecution, it could have convinced the average finder of fact of Secessions's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus (1991).

**{¶28}** The elements of robbery are contained in R.C. 2911.02. Under R.C. 2911.02(A), "[n]o person, in attempting or committing a theft offense * * * shall * * * [i]nflict * * * physical harm on another [or] [u]se * * * force against another." Although many crimes qualify as "[t]heft offense[s]," the state alleged that Secessions violated R.C. 2913.02(A)(1). See R.C. 2913.01(K) (defining theft offense). Under that section, "[n]o person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * property * * * [w]ithout the consent of the owner."

**{¶29}** Secessions has noted that the keys and money he allegedly took from Smith-Cage were never recovered. He has argued that considering that he was

arrested less than 24 hours after the alleged robbery, if he had actually taken Smith-Cage's money and keys, they would have been found in his possession when he was arrested. According to Secessions, because he did not have Smith-Cage's possessions when he was arrested, there was no evidence that he had exerted control over them.

{¶30} To satisfy the elements of robbery, the state needed to present evidence that Secessions "obtain[ed]" or "exert[ed] control" over Smith-Cage's property. R.C. 2911.02(A) and 2913.02(A)(1). We have defined the term "obtain" to mean " 'to get, to secure possession of.' " *State v. Toney*, 9th Dist. No. 04CA0013, 2004-Ohio-4877, at ¶ 18, quoting *State v. Healy,* 156 Ohio St.229, 239 (1951). Smith-Cage testified that Secessions took her car keys from her hand and her money from her bra. We have no hesitation concluding that those actions constituted "obtain[ing]" her property under R.C. 2913.02(A)(1). The fact that Secessions did not have possession of them at the time he was arrested is immaterial. Secessions's third assignment of error is overruled.

## MANIFEST WEIGHT

{¶31} Secessions's fourth assignment of error is that his conviction is against the manifest weight of the evidence. If a defendant argues that his conviction is against the manifest weight of the evidence, we "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (1986).

{¶32} Secessions has argued that Smith-Cage's testimony was less credible than Smith's and Mosley's testimony. According to him, there were inconsistencies in

what she told the paramedic and police officers after they arrived. He has also argued that if he had choked her as much as she claimed, her injuries would have been more extensive than how they appeared in the photographs Detective Ross took.

{¶33} Secessions is correct that there were some inconsistencies in the testimony of the state's witnesses. According to Dusseau, Smith-Cage told him that Secessions choked her for one minute and that she had drunk a 40-ounce beer earlier that night. At trial, she testified that Secessions choked her for two to three minutes and that although she had consumed a couple of alcoholic drinks, she had not had a 40-ounce beer. According to Officer Heller, she told him that she dropped the others off at the after-hours bar and drove back to it when they called her about Smith's missing cash. At trial, Smith-Cage testified that she exited the car with the others and was going to enter the after-hours bar to use the bathroom until she changed her mind. Officer Heller also testified that Smith-Cage told him that Secessions took the keys to her car from the ignition. At trial, she testified that he took them from her hand.

{¶34} Officer Heller explained that it was difficult to take Smith-Cage's statement or piece together a story about what had happened because she was crying, holding her throat, wheezing, and gasping for air. He thought she might be having an asthma attack because of her difficulty breathing. He also explained that his goal was to gather information as quickly as he could while the paramedics treated Smith-Cage so he could notify other officers in case there were any suspects still in the area. Accordingly, the jury could have reasonably attributed the inconsistencies between Dusseau's and Officer Heller's reports and Smith-Cage's testimony to the manner and the circumstances under which the information was collected.

{¶35} During their closing arguments, Secessions's and Smith's lawyers pointed out each of the inconsistencies between what Smith-Cage testified and what she had told Officer Heller, Dusseau, and Detective Ross the night of the event. The jury reviewed the evidence, including Smith-Cage's 9-1-1 call and the photographs of her injuries, and concluded that she was credible. Upon review of the record, we are unable to say that it clearly lost its way. Secessions's fourth assignment of error is overruled.

CONCLUSION

{¶36} Smith-Cage's statement about Smith's brother's bribery attempt was not so inflammatory that it was plain error for the trial court to fail to declare a mistrial sua sponte. Secessions has not established that he was prejudiced by not knowing about Smith-Cage's bribery allegations a day earlier, his robbery conviction is supported by sufficient evidence, and his conviction was not against the manifest weight of the evidence. The judgment of the Summit County Common Pleas Court is affirmed.

Judgment affirmed.

BELFANCE, P.J., concurs separately.

CARR, J., concurs in judgment only.

_____

BELFANCE, Presiding Judge, concurring.

{¶37} I concur. I write separately to emphasize that I do not condone the conduct of the prosecutor in failing to disclose the information concerning the alleged bribe to defense counsel and eliciting this testimony from the witness. However, I agree

that in light of the specific facts presented and our standard of review, the trial court's failure to sua sponte declare a mistrial does not rise to the level of plain error. The alleged bribe was not made by Secessions or a member of Secessions's family, and, therefore, Secessions was not directly connected to the bribe. Accordingly, I concur.

_____

CARR, Judge, concurring in judgment only.

{¶38} I join in Judge Belfance's concerns in her separate opinion. I concur separately on the basis that I would analyze the discovery dispute differently than the majority. First, the prosecutor had a mandatory duty to disclose the alleged bribery statement. Second, Secessions was not prejudiced because the testimony was stricken by the trial court and the jury was instructed to disregard it.

_____