[Cite as *State v. Smith*, 2012-Ohio-2614.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

    v.

DEDOSHA C. SMITH

    Appellant

C.A. No.     25834

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     CR 10 04 1055 (B)

DECISION AND JOURNAL ENTRY

Dated: June 13, 2012

---

DICKINSON, Judge.

INTRODUCTION

{¶1}    With the help of her boyfriend, Dedosha Smith allegedly robbed Malissa Smith-Cage after Ms. Smith-Cage drove them to an after-hours bar. The Grand Jury indicted Ms. Smith for aggravated robbery and robbery. A jury found her guilty of robbery, and the trial court sentenced her to three years in prison. Ms. Smith has appealed, assigning as error that the trial court incorrectly failed to declare a mistrial, that the prosecutor engaged in misconduct, that her trial lawyer was ineffective, and that the jury's verdict was against the manifest weight of the evidence. We reverse because the prosecutor committed misconduct when she intentionally elicited from Ms. Smith-Cage that Ms. Smith's brother attempted to bribe her not to testify and there is a reasonable possibility that the testimony had an effect on the outcome of the trial.

FACTS

**{¶2}** Ms. Smith-Cage testified that she was working at a club on the evening of April 10, 2010, when Ms. Smith, a coworker, asked if Ms. Smith-Cage could give her a ride after they were finished. Ms. Smith-Cage agreed because she thought Ms. Smith only needed a ride home and it would not be out of her way. When the time came to go, Ms. Smith asked Ms. Smith-Cage if she could also take her boyfriend, Timothy Secessions, and his friend Gordon Mosley because the men had been waiting for her. Ms. Smith-Cage eventually agreed.

**{¶3}** Ms. Smith-Cage testified that she did not know exactly where Ms. Smith wanted to go so she followed her directions as she drove. She said that Ms. Smith guided her to an after-hours bar and asked her to drop them off. By then, Ms. Smith-Cage had to go to the bathroom, so she got out of the car with the others and walked to the building. As she got near the door, she felt uncomfortable, so she decided to return to her car. Before she could leave, Ms. Smith stopped her and told her that she thought she had dropped some money in the car. Ms. Smith-Cage, therefore, helped Ms. Smith look for the money.

**{¶4}** According to Ms. Smith-Cage, she looked in the front of the car then got out to move the driver's seat forward. As she was looking under the seat, Mr. Secessions suddenly grabbed her neck from behind and started choking her. He pushed her into the back of the car, grabbed her keys from her hand, and continued choking her. Ms. Smith, meanwhile, got in the front passenger seat and began going through the car's glove box and console, looking for money and encouraging Mr. Secessions. Because Mr. Secessions had his hands around her neck, Ms. Smith-Cage could not speak, but she pulled her shirt down to show him that she had money tucked inside her bra. Mr. Secessions grabbed the money and left. From the back of the car, Ms. Smith-Cage reached for her cell phone, which was in the center console, and got into a struggle

with Ms. Smith, who had seen her reaching for it. Ms. Smith-Cage testified that she won the struggle, that Ms. Smith fled the car, and that Ms. Smith-Cage called 911.

{¶5} Ms. Smith told an entirely different story. She testified that, as Ms. Smith-Cage was turning into the after-hours bar parking lot, she turned too sharply and almost drove into a ditch. The car's sudden stop tipped Ms. Smith's purse over and spilled its contents on the floor. Ms. Smith tried to pick everything up, but, apparently, did not see her money. She testified that, after Ms. Smith-Cage parked the car, the four of them entered the after-hours bar and ordered drinks. When she tried to pay for her drink, she noticed that her money was missing and told Ms. Smith-Cage that it must be in the car. She and Ms. Smith-Cage went out to the car to look for it, with Ms. Smith going to the passenger's side and Ms. Smith-Cage going to the driver's side.

{¶6} Ms. Smith testified that, before she could look in the car, she noticed that her food assistance benefits card was on the ground next to it. She picked up the card and turned to start looking in the car when she saw Ms. Smith-Cage pick up her money and put it in her bra. Ms. Smith-Cage would not give the money back, so the two of them started arguing. At some point, Mr. Secessions came out of the after-hours bar, learned what had happened, and confronted Ms. Smith-Cage. When Ms. Smith-Cage got too close to him, Mr. Secessions grabbed her by the neck and shoved her to the ground. At that point, Ms. Smith convinced Mr. Secessions to leave with her, deciding she could bring the issue up again the next time she saw Ms. Smith-Cage at work. She reentered the after-hours bar, Mr. Secessions paid for their drinks, and then she, Mr. Secessions, and Mr. Mosley walked together to their houses, which were only a few blocks away. As they were leaving, Ms. Smith-Cage threw her keys at them and hit Mr. Secessions, so Ms. Smith picked up the keys and threw them in a field.

{¶7} Mr. Mosley testified that everyone entered the after-hours bar together and ordered drinks. At some point the others got up and went outside, so he followed them. When he got outside, he saw Ms. Smith-Cage "brushing up" on Mr. Secessions, "talking about mak[ing] something right." Mr. Secessions pushed Ms. Smith-Cage to get her off of him. He, Ms. Smith, and Mr. Secessions went back inside the after-hours bar, paid for their drinks, and then walked home. He did not hear everything that the others were talking about outside, but thought it was about lost money.

{¶8} Police officer Brent Heller testified that he was the first one to arrive after Ms. Smith-Cage called 911. He said it was difficult to talk to Ms. Smith-Cage because "she was crying, holding her throat, trying to breathe; she's wheezing, you know, gasping for air." Ms. Smith-Cage told him that Mr. Secessions had choked her and had taken her keys out of the car's ignition. He said that, because her skin tone is dark, he could not see any discoloration, but could tell that "her neck was a little puffy." He also testified that it looked like the stuff in her car had been gone through, with everything that had been in the glove box thrown onto the front passenger's seat.

{¶9} Paramedic Brian Dusseau testified that he examined Ms. Smith-Cage outside the after-hours bar. He said that she told him she had been choked with two hands for a minute and complained of neck pain. Her pulse was 120. Although he did not see any external injuries, he testified that it can take some time for bruises to appear. He also said that he recommended to Ms. Smith-Cage that she go to the hospital for further evaluation.

{¶10} Detective John Ross testified that he spoke to Ms. Smith-Cage while she was waiting to see a doctor at the hospital and saw ligature marks across her throat. He took a statement from her then drove her home because she didn't want to wait to see a doctor. He

returned to her house later that day to ask her additional questions and take pictures of her neck. He also testified that the police had to tow her car because they were concerned Mr. Secessions might return to the parking lot and take it.

{¶11} The Grand Jury indicted Mr. Secessions and Ms. Smith for aggravated robbery and robbery, and they were tried together to a jury. At the conclusion of the State's case, the trial court granted the defendants' motions for a directed verdict on the aggravated robbery charges. The jury found Ms. Smith guilty of robbery, and the trial court sentenced her to three years in prison.

## PROSECUTORIAL MISCONDUCT

{¶12} Ms. Smith's second assignment of error is that the prosecutor engaged in misconduct that deprived her of the right to a fair trial. She has noted that, on direct examination, the prosecutor asked Ms. Smith-Cage whether she saw "any of Dedosha Smith or Timothy Secessions' family members after this incident." Ms. Smith-Cage answered "[y]es." The prosecutor asked "[w]here was that?" and Ms. Smith-Cage replied "[h]er brother come to my job." After clarifying that Ms. Smith-Cage was referring to Ms. Smith's brother, she asked: "And what was that about?" Ms. Smith-Cage answered: "He wanted to offer me money not to come to court."

{¶13} Ms. Smith has argued that the prosecutor's line of questions was improper for two reasons. First, the prosecutor failed to tell her that her brother had attempted to bribe Ms. Smith-Cage. According to Ms. Smith, the prosecutor violated her duty to disclose the statements of witnesses under Rule 16(B)(7) of the Ohio Rules of Criminal Procedure. Second, the questions were improper because whether her brother attempted to bribe a witness was inadmissible unless she was connected with the attempt.

{¶14} After Ms. Smith objected to the prosecutor's question about why her brother had gone to Ms. Smith-Cage's workplace, the trial court held a sidebar. Ms. Smith argued that the prosecutor had not disclosed any statements regarding the bribery attempt, so the court asked the prosecutor whether Ms. Smith-Cage's testimony was "news to you?" The prosecutor explained that she had learned about it "yesterday when we were talking."

{¶15} In general, the test for prosecutorial misconduct is whether the prosecutor's conduct or remarks were improper and, if so, whether the improper acts prejudicially affected the accused's substantial rights. *State v. Lynch*, 98 Ohio St. 3d 514, 2003-Ohio-2284, at ¶ 145. In *State v. Secessions*, 196 Ohio App. 3d 741, 2011-Ohio-6066 (9th Dist.), this Court concluded that, "upon learning about Ms. Smith-Cage's [bribery] allegations," the prosecutor was obliged to tell Ms. Smith and Mr. Secessions about them, even though the trial had already begun. *Id*. at ¶ 24. We also determined that it was improper for the prosecutor to elicit testimony about the bribery attempt because "[a]ttempts by persons other than the accused to bribe witnesses . . . are evidence against the accused when, but only when, it is proven that he was connected with such attempts. Acts and statements of third persons, not known or authorized by him, are inadmissible." *Id*. at ¶ 13 (quoting *State v. Smith*, 49 Ohio St. 3d 137, 143 (1990)).

{¶16} Upon review of the record, we note that the prosecutor specifically raised the issue of whether Ms. Smith-Cage had spoken with any of Ms. Smith's family members after the alleged robbery. She also argued at sidebar that her inquiry was appropriate because "[i]t's relevant to they are fearful of coming to court because she's going to tell the truth about what happened." Her questions, however, were not appropriate, and we conclude that she committed misconduct by asking them. *See State v. Diar*, 120 Ohio St. 3d 460, 2008-Ohio-6266, ¶ 208 ("The prosecutor committed misconduct by asking an improper question.").

{¶17} The Ohio Supreme Court has cited different tests for determining whether a conviction must be reversed for prosecutorial misconduct depending on whether the improper conduct was a discovery violation or something said by the prosecutor during the course of trial. Regarding a failure to provide discovery under Criminal Rule 16(B), in *State v. Hale*, 119 Ohio St. 3d 118, 2008-Ohio-3426, the Supreme Court recognized that Criminal Rule 16(E) "vests the trial court 'with a certain amount of discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material.'" *Id.* at ¶ 114 (quoting *State v. Parson*, 6 Ohio St. 3d 442, 445 (1983)). It also recognized that "*Parson* established guidelines for evaluating the trial court's exercise of discretion . . . ." *Id.* at ¶ 115. Those factors are whether the prosecutor's failure to disclose was a willful violation of Criminal Rule 16, whether foreknowledge of the statement would have benefited the accused in the preparation of her defense, and whether the accused was prejudiced by the admission of the statement. *Parson*, 6 Ohio St. 3d 442, at syllabus. Regarding an improper question or remark by the prosecutor during trial, in *State v. Smith*, 14 Ohio St. 3d 13 (1984), the Supreme Court recognized that the inquiry is whether the remark "prejudicially affected substantial rights of the defendant." *Id.* at 14 (applying test to improper remark during closing argument); *State v. Treesh*, 90 Ohio St. 3d 460, 480 (2001) (applying test to improper questioning of witness).

{¶18} In this case, the greater harm to Ms. Smith was not that she did not know about Ms. Smith-Cage's statement before Ms. Smith-Cage testified, but that the prosecutor elicited the statement in front of the jury. Accordingly, our focus is on whether Ms. Smith-Cage's testimony about the bribery attempt affected Ms. Smith's substantial rights.

{¶19} Following the sidebar, the trial court struck Ms. Smith-Cage's statement and instructed the jury "to disregard that last statement." It also told the jurors that "[a]ny such

statement on that cannot be blameful against these two separate Defendants." While charging the jury, the court further told the jurors that "[t]he evidence does not include any answers to questions that I've instructed you to disregard."

{¶20} Despite the fact that the court instructed the jury to disregard Ms. Smith-Cage's answer, we conclude that there is a reasonable possibility that the prosecutor's improper questions affected the outcome of the trial. *See State v. Smith*, 49 Ohio St. 3d 137, 143 (1990). The evidence in this case was far from overwhelming. Ms. Smith-Cage was the only witness who testified that Ms. Smith and Mr. Secessions robbed her and there was little corroborating physical evidence. First responders did not notice any significant bruising to Ms. Smith-Cage's neck and observed that it was only a little puffy. Even if there was some bruising and puffiness, those symptoms were equally consistent with Ms. Smith's version of the facts. In addition, Ms. Smith-Cage's gasping and wheezing when talking to Officer Heller could have been theatrical. We note that, although she initially agreed to go to the hospital, she departed before being examined.

{¶21} The danger in allowing a witness to testify about a bribery attempt that was not authorized by the defendant is that "it may seem to a jury as if the accused must be guilty of the charges against [her]." *State v. Wilson*, 8th Dist. No. 86092, 2006-Ohio-1333, at ¶ 6. In *State v. Secessions*, 9th Dist. No. 25754, 2011-Ohio-6066, we upheld the conviction of Ms. Smith's co-defendant despite Ms. Smith-Cage's bribery-attempt statement. We noted that the alleged bribery attempt did not involve Mr. Secessions or a member of his family, but only a family member of his co-defendant. We concluded that Ms. Smith-Cage's "single statement . . . was not so inflammatory regarding Mr. Secessions's case to overcome the presumption that the jury followed the trial court's curative instructions." *Id*. at ¶ 19.

**{¶22}** This case is distinguishable from *Secessions* because, while Mr. Secessions "was not directly connected to the bribe," it was Ms. Smith's brother who allegedly attempted it. *State v. Secessions*, 9th Dist. No. 25754, 2011-Ohio-6066, at ¶ 37 (Belfance, P.J., concurring). In addition, Mr. Secessions did not argue prosecutorial misconduct. Rather, the issue was whether the trial court committed plain error when it did not sua sponte declare a mistrial. *Id*. at ¶ 14. Regarding this case, upon review of the record, we are unable to say that Ms. Smith-Cage's allegation that Ms. Smith's brother attempted to bribe her did not affect Ms. Smith's substantial rights. Ms. Smith's second assignment of error is sustained. Her first, third, and fourth assignments of error are moot, and are overruled on that basis. *See* App. R. 12(A)(1)(c).

## CONCLUSION

**{¶23}** The prosecutor improperly elicited that Ms. Smith's brother attempted to bribe Ms. Smith-Cage not to testify. The judgment of the Summit County Common Pleas Court is reversed, and this matter is remanded for proceedings consistent with this decision.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

_____
CLAIR E. DICKINSON
FOR THE COURT

CARR, J.
BELFANCE, J.
CONCUR.

APPEARANCES:

MELISSA M. PRENDERGAST, Assistant State Public Defender, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.