[Cite as *State v. Jones*, 2017-Ohio-636.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 28132 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| RENARD JONES | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2014 11 3501 (NN) |

DECISION AND JOURNAL ENTRY

Dated: February 22, 2017

CARR, Presiding Judge.

{¶1} Defendant-Appellant, Renard Jones, appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On the evening of November 15, 2014, multiple law enforcement agencies conducted a raid at a home in Akron. The raid occurred because the police suspected that a large scale, illegal dogfight was set to occur on the property. As a result of the raid, the police arrested more than 45 individuals in connection with dogfighting. Jones was one of the individuals whom the police arrested. At the time of his arrest, he had $303 in cash on his person.

{¶3} A grand jury indicted Jones on one count of dogfighting, in violation of R.C. 959.16(A)(5), as well as a criminal forfeiture specification for the $303 in cash. Jones ultimately went to trial along with three of his co-defendants, all of whom requested a jury trial. At the conclusion of the trial, the trial court entered a judgment in favor of Jones on the forfeiture

specification. The jury then deliberated on the remaining dogfighting charge and found Jones

guilty. The court sentenced him to two years of community control.

{¶4}   Jones now appeals from his conviction and raises four assignments of error for

our review. For ease of analysis, we reorder and consolidate several of the assignments of error.

II.

## ASSIGNMENT OF ERROR III

DEFENDANT'S CONVICTION FOR DOGFIGHTING WAS AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR
WHEN IT OVERRULED DEFENDANT'S CRIM. R. 29(A) MOTION FOR
JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE WAS
INSUFFICIENT TO SUPPORT A CONVICTION FOR DOGFIGHTING[.]

{¶5}   In his fourth assignment of error, Jones argues that the trial court erred by denying

his motion for acquittal because his conviction for dogfighting is based on insufficient evidence.

In his third assignment of error, he argues that his conviction is against the weight of the

evidence. We disagree with both propositions.

**Sufficiency of the Evidence**

{¶6}   Crim.R. 29(A) provides, in relevant part:

The court on motion of a defendant or on its own motion, after the evidence on
either side is closed, shall order the entry of a judgment of acquittal of one or
more offenses charged in the indictment * * * if the evidence is insufficient to
sustain a conviction of such offense or offenses. The court may not reserve ruling
on a motion for judgment of acquittal made at the close of the state's case.

When reviewing the sufficiency of the evidence, this Court must review the evidence in a light

most favorable to the prosecution to determine whether the evidence before the trial court was

sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶7} R.C. 959.16(A)(5) provides that "[n]o person shall knowingly * * * [p]ay money or give anything else of value in exchange for admission to or be present at a dogfight." This Court recently examined the foregoing statute and found it to be ambiguous. *See State v. Taylor*, 9th Dist. Summit No. 28091, 2016-Ohio-7953. We, therefore, conducted a statutory analysis and determined that R.C. 959.16(A)(5)'s legislative history supports a disjunctive reading of the statute. *Id.* at ¶ 12-15. We held that, to support a conviction under R.C. 959.16(A)(5), the State may prove either that a person (1) knowingly paid money or gave something of value for admission to a dogfight, or (2) knowingly was present at a dogfight. *Id.* at ¶ 15. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Former R.C. 2901.22(B).

{¶8} Captain Clark Westfall testified that he helped organize a raid at a home in Akron, where the police suspected that the owner was conducting a dogfighting operation. As part of its case-in-chief, the State introduced several pictures of the target residence, two of which are aerial map views. The pictures show that the home is located at the end of a dead-end street and has a sizeable backyard that abuts a noise barrier for the freeway. The backyard contains a detached garage as well as a freestanding trailer. The front of the home faces west, and the entire backyard is enclosed by a fence. The fence joins to the house on the house's north and south

sides such that the fence traverses the driveway for the residence. The portion of the fence that traverses the driveway and connects with the south side of the house is a large, retractable gate.

{¶9} Captain Westfall testified that multiple law enforcement agencies took positions around the target residence at approximately 7:00 p.m. and conducted surveillance as numerous people entered the fenced-in backyard. The Captain learned from a source that the property's retractable gate was closed and locked when dogfighting activity was occurring. Accordingly, that evening, an armored vehicle was waiting at a nearby facility for Captain Westfall's command. Once the gate to the property closed, Captain Westfall signaled for the armored vehicle, which breached the retractable gate at 10:41 p.m. Captain Westfall testified that, from the point in time that the retractable gate closed until the armored vehicle arrived to breach it, between nine and ten minutes elapsed. During that time, other officers conducted surveillance to ensure that no one was walking on the street outside the residence or leaving the residence. Captain Westfall testified that he was positive the gate to the residence was securely closed when the armored vehicle arrived. He stated that, once the gate was breached, the scene became "very chaotic" with people "running around, throwing things, [and] screaming." A total of 52 law enforcement officers ultimately responded to the scene that evening, and 47 individuals were arrested.

{¶10} On the evening of the raid, Detective Mark Hockman was tasked with maintaining surveillance from a public walkway that ran along the south edge of the target residence. From his position, he could observe portions of the backyard as well as the street leading to the property. According to Detective Hockman, the police were led to believe a dogfight would occur at the property between 10:00 and 11:00 p.m. and that the fight would begin when the retractable gate closed. Eventually, the gate closed, and Detective Hockman

watched for approximately 12 more minutes. He testified that he never saw anyone on the street outside the residence during that 12-minute time period. He did observe, however, the individuals gathered in the backyard form "a single file formation towards the north end of the [detached] garage." Detective Hockman could not see the north side of the garage from his position, but knew that a man door was located there and assumed that the group was walking into the garage. He testified that, at some point before the armored vehicle arrived, he then noticed individuals leaving the garage area. Although Detective Hockman could not recall exactly how long the individuals that he saw remained in the garage area, he confirmed that a typical dogfight can last anywhere from 30 seconds to an hour.

{¶11} Detective Hockman testified that, as soon as the armored vehicle breached the retractable gate, people scattered and "were flying out of the garage and running in * * * all sorts of directions." He quickly went to assist other officers in their attempt to detain the fleeing individuals and, following the chaos, further aided in the investigation on the property. He testified that the police ultimately seized $52,000 that evening and $303 of that amount came from Jones. Detective Hockman confirmed that several of the individuals they arrested that evening came from out of state and that dogfighting is funded by both the spectators who pay admission to watch the fights and the gambling that takes place when individuals bet on the outcomes of the fights. According to Detective Hockman, dogfights are meticulously planned well in advance and are "very secretive." With regard to the target residence here, Detective Hockman noted that someone "went to great lengths [to] secur[e] [it] as a clandestine area to operate * * * these dogfights * * *." He opined, based on his training and experience, that it would not be possible for someone to be present and not know they were at a dogfight.

{¶12} Detective Brian Boss testified that he acted as the lead operator for the Akron SWAT team when the raid ensued. He stated that his team was the first to breach the backyard after the gate was compromised and that he immediately rounded the southeast corner of the house. In the area between the north side of the detached garage and the north fence line, he briefly observed approximately 40 people standing near the garage watching two men taunt two pit bulls on separate leashes. The crowd then scattered, and Detective Boss and his team gave chase. He testified that there was "cash everywhere," including on the ground.

{¶13} Officer Delvin Pickett, a member of the crime scene unit, testified that he took a video recording of the scene at the property after the raid occurred. The video recording documents numerous items related to dogfighting. Inside the detached garage at the property, Officer Pickett found a large, square, freestanding ring that looks to have been constructed from wood and other materials. The inside flooring of the ring was carpeted and had several long pieces of duct tape arranged in lines. Officer Pickett stated that both the lines of duct tape and the inside walls of the ring were covered in "wet, fresh blood." Officer Pickett also found inside the garage buckets of water, sponges, and bloodied break sticks. There was testimony that break sticks are used to pry open a dog's mouth when it has latched onto another dog.

{¶14} Apart from the detached garage, Officer Pickett also documented the inside of the freestanding trailer at the southeast corner of the backyard and a separate, fenced area that he found there. The trailer contained more buckets of water and sponges, a filthy shower area, and weighing scales. In the separate, fenced area, Officer Pickett found individual, enclosed cages for dogs, kennels, chains, and bowls. At the time that he recorded the scene, at least one dog was still confined in one of the kennels in the fenced-in area.

{¶15} In addition to filming the contents of the structures on the property, Officer Pickett also documented the numerous vehicles that were on scene when the raid commenced. Several of the vehicles were parked inside the enclosed backyard and additional vehicles were parked at a vacant lot that was located to the north of the target residence. Officer Pickett testified that he was able to observe kennels in a number of the vehicles that he recorded, including the vehicles parked in the backyard. At least one of the kennels had a dog inside of it.

{¶16} Detective Mildred Morris, another member of the crime scene unit, testified that she also documented various aspects of the scene that evening. As part of her duties, Detective Morris photographed several of the individuals who were arrested at the scene. She identified Jones as one of the arrestees whom she photographed that evening.

{¶17} Officer Tim Harland testified that he works for the Summit County Humane Society and was present at the target residence to secure the dogs on scene and provide them any necessary medical treatment. He testified that he ultimately collected eight dogs from the property that evening, all of which were either pit bulls or pit bull mixes. Of the eight dogs collected, one dog had to be euthanized for safety reasons because he was vicious. Two of the other dogs had actively bleeding puncture wounds that were consistent with injuries a dog would receive from another dog. Based on his training and experience, Officer Harland opined that the two injured dogs had been involved in a dogfight "[v]ery recently."

{¶18} Maurice Wynn, Jr., one of Jones' co-defendants, testified for the State pursuant to a plea agreement. Wynn agreed that he came to the target residence the evening of the raid to watch dogfights and that the owner of the residence, Alvin Banks, charged him $75 to see the fights. Wynn testified that Banks personally called him to invite him to the fights. According to Wynn, he came to the fights alone, could not say who else was there, did not know how any of

the other people there received their invitations, and did not know if anyone else paid to see the fights. Wynn agreed that people were betting on the winners of the dogfights that night and that one dogfight took place before the police conducted their raid. He testified that the fight took place inside the detached garage and that, before it started, Banks signaled for him to enter the garage. Wynn admitted that there were other people in the garage, but stated that he did not know how many. He did agree, however, that everyone who had been gathered in the yard went into the garage and that he came back outside when the fight ended. Wynn was unable to say how long the fight lasted, but did say that it was not a long period of time.

{¶19} Robby Hollis, another of Jones' co-defendants, also testified for the State pursuant to a plea agreement. Hollis admitted that he had been friends with Alvin Banks for several years and that, before the evening of the raid, he had attended dogfights at Banks' residence on two separate occasions. Hollis testified that Banks invited him to fights by word of mouth. He agreed that, during the two previous fights, he personally saw Banks collect money from people for admittance to the fights. According to Hollis, Banks was standing near the retractable gate when he arrived on the evening of the raid and waived him through without payment. He was able to observe, however, Banks collect money from four or five other individuals as he made his way inside. Hollis indicated that he saw two injured dogs standing by the gate when he arrived, but that he missed the first dogfight that occurred that evening. He agreed that people were gambling on the dogs at the fights he previously attended at Banks' residence.

{¶20} It was Hollis' testimony that he saw Jones in Banks' backyard on the evening of the fight. He could not say, however, whether Jones arrived before or after him or whether Jones

had paid Banks any money for admittance. According to Hollis, he was at the target residence for approximately 20 minutes before the police arrived and never saw a dogfight.

{¶21} Jones argues that the trial court erred by denying his Crim.R. 29 motion for acquittal because there was no evidence that he paid money or gave anything of value for admission to a dogfight or that he actually witnessed a dogfight. He notes that there was no testimony regarding when he arrived at the target residence that evening or whether he paid anyone money when he arrived. According to Jones, the State failed to prove that he did not, in fact, arrive after Hollis and, like Hollis, never saw a dogfight that evening.

{¶22} As previously noted, this Court has interpreted R.C. 959.16(A)(5) as requiring the State to prove *either* that a person (1) knowingly paid money or gave something of value for admission to a dogfight, *or* (2) knowingly was present at a dogfight. *Taylor*, 2016-Ohio-7953, at ¶ 15. Accordingly, the State was not required to prove that Jones paid money or gave something of value for admission to the dogfight(s) at the target residence. His conviction can stand so long as the State set forth sufficient evidence that he was knowingly present at a dogfight. Viewing all the evidence in a light most favorable to the State, we must conclude that the State satisfied its burden of production on that issue.

{¶23} There was limited testimony at trial that specifically pertained to Jones, but Detective Morris did identify him as one of the arrestees she photographed at the target property and Detective Hockman did testify that, at the time of his arrest, Jones had $303 in cash on his person. Moreover, Detective Hockman opined, based on his training and experience, that it would have been impossible for someone to be present that evening and not know they were at a dogfight. He noted that dogfights are "very secretive" and planned well in advance. There was testimony that the property here was entirely surrounded by a fence and that the large, retractable

gate that completed the enclosure was secured when the dogfights started. There also was testimony that, from the time the gate closed until it was breached, it remained closed and, during that timeframe, the crowd appeared to enter the detached garage where the fight occurred. Detective Boss also saw a large crowd watching two men taunt two pit bulls when he entered the property behind the armored vehicle. There was testimony that the police collected approximately $52,000 that evening and that they found significant sums of money on the ground where it had been thrown when the raid commenced. "Given the presence of the dogs, the behavior of the crowd, the clandestine nature of the event, and the large quantities of money that the crowd had on hand, a rational trier of fact could have concluded that [Jones] was knowingly present at a dogfight that evening." *State v. Spear*, 9th Dist. Summit No. 28181, 2017-Ohio-169, ¶ 22. *See also* former R.C. 2901.22(B) (defining the circumstances in which a person acts "knowingly"). Jones has not shown that the trial court erred when it denied his motion for acquittal. Consequently, his fourth assignment of error is overruled.

**Weight of the Evidence**

{¶24} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An

appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶25} Jones addresses his sufficiency and weight arguments together and has not set forth a separate basis for the two. "[S]ufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. Jones has not challenged any of the evidence the State set forth as "unreliable or lacking credibility." *State v. Smith*, 9th Dist. Summit No. 27877, 2016-Ohio-7278, ¶ 16. This Court will not develop a manifest weight argument on his behalf. *See State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 32. "We have already determined that his conviction is based on sufficient evidence, and [Jones] has not shown that this is the exceptional case where the trier of fact lost its way in convicting him." *Taylor*, 2016-Ohio-7953, at ¶ 39. Accordingly, his third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR BY OVERRULING MR. JONES' OBJECTION AND DECLARING MR. WYNN TO BE A HOSTILE WITNESS.

{¶26} In his first assignment of error, Jones argues that the trial court committed reversible as well as plain error when it declared a State's witness hostile and allowed the State to ask him leading questions on direct examination. Because Jones has not explained how he was prejudiced by the court's ruling, we overrule his assignment of error.

{¶27} "Evid.R. 611(C) generally prohibits the use of leading questions on direct examination." *State v. McKelton*, Slip Opinion No. 2016-Ohio-5735, ¶ 150. Even so, this Court has held that "[l]eading questions * * * may not be a ground for reversal on review unless

prejudice results." *State v. Foster*, 9th Dist. Summit No. 14277, 1990 WL 72345, *2 (May 23, 1990).

**{¶28}** Jones went to trial along with several co-defendants, and this Court recently issued a decision involving one of those co-defendants. *See State v. Spear*, 9th Dist. Summit No. 28181, 2017-Ohio-169. Jones' co-defendant also challenged the trial court's decision to allow the State to cross-examine Wynn on direct examination. *Id.* at ¶ 23-30. We rejected his argument because, even assuming the court had erred by declaring Wynn hostile or adverse, he failed to explain how he was prejudiced by that error. *Id.* at ¶ 30. Jones has likewise failed to explain how the court's error, if any, prejudiced him. *See Foster* at *2. His argument is strictly that Wynn was not hostile or adverse to the State, as those terms are legally defined. Without a demonstration of prejudice, however, Jones is not entitled to relief. *See id.* Because he has made no attempt to explain how he was prejudiced by the court's ruling, we will not construct an argument on his behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). His first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

> MR. JONES WAS DENIED A FAIR TRIAL DUE TO THE PROSECUTING ATTORNEY ENGAGING IN PROSECUTORIAL MISCONDUCT BY MISLEADING THE DEFENSE AND NOT DISCLOSING PERTINENT INFORMATION IN VIOLATION OF CRIM. R. 16.

**{¶29}** In his second assignment of error, Jones argues that his conviction must be overturned on the basis of prosecutorial misconduct. Specifically, he argues that he was denied a fair trial when the prosecutor did not disclose pertinent information in violation of Crim.R. 16. For the reasons set forth below, we reject his second assignment of error.

**{¶30}** "The rules of discovery, and more specifically Crim.R. 16, imbue trial courts with the discretion to exclude testimony that is not disclosed in a timely manner in order to prevent

surprise and ensure a fair trial." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 30. Crim.R. 16 requires the State, upon a defendant's written demand for discovery, to provide the defense with "[a]ny written or recorded statement by * * * a co-defendant * * *" or "by a witness in the [S]tate's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal." Crim.R. 16(B)(1), (7). "While the rule mentions only written or recorded statements, the Ohio Supreme Court has held that the [S]tate must also disclose oral statements, even though they 'may have not been actually reduced to a written summary.'" *State v. Secessions*, 196 Ohio App.3d 741, 2011-Ohio-6066, ¶ 22 (9th Dist.), quoting *State v. Parson*, 6 Ohio St.3d 442, 445 (1983). "Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that: (1) the prosecution's failure to disclose was a willful violation of the rule; (2) knowledge of the information would have benefited the accused in the preparation of the defense; and (3) the accused suffered some prejudicial effect." *Sadeghi*, 2016-Ohio-744, at ¶ 16, citing *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995). "The overall purpose [of the rule] is to produce a fair trial." *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987).

{¶31} Jones' prosecutorial misconduct argument concerns the testimony of Hollis, one of his co-defendants who testified against him at trial. On direct examination, the State did not ask Hollis whether he had seen Jones on the evening in question. Following defense counsel's cross-examination, however, the prosecutor showed Hollis a picture of Jones for the purpose of asking him if he could identify Jones as one of the individuals he saw at the target residence that evening. A sidebar discussion then took place, during which defense counsel notified the court that he had not been told Hollis could identify Jones and that, throughout discovery, the prosecutor had represented that there were no witnesses who could identify his client. The prosecutor then informed the court that he had met with Hollis late in the afternoon the Friday

before trial commenced. During their meeting, Hollis indicated that he could place Jones at the scene. The prosecutor admitted that he never informed defense counsel that Hollis could identify Jones. After listening to argument from both sides, the court ultimately decided to allow Hollis to identify Jones. The court allowed defense counsel another opportunity to fully cross-examine Hollis, without being limited to new issues raised on rebuttal.

{¶32} Jones argues that it was error for the court to allow Hollis to identify him as one of the individuals he saw at the target residence on the evening in question. He argues that, because the prosecutor willfully withheld that information, it should not have been admitted. According to Jones, he was prejudiced by the admission of that testimony because, "[h]ad he known about this eye witness testimony prior to trial, his strategy at trial and in cross-examining the witnesses would have been different."

{¶33} Even assuming that the prosecutor willfully violated Crim.R. 16 and that the information he received from Hollis would have benefitted Jones in his defense preparation, we fail to see how Jones suffered any actual prejudice here. *See Sadeghi*, 2016-Ohio-744, at ¶ 16. As Jones acknowledges, Hollis was unable to say when Jones arrived at the target residence, whether he saw any dogfight, or whether he paid any money for admission to the fight. His testimony was merely that he saw Jones at the target residence. Detective Morris testified that Jones was one of the people who she photographed on the evening of the raid, following his arrest. Additionally, there was testimony that the police only arrested individuals who were inside the secured gate surrounding the target residence that evening, as they had constantly monitored the street to make sure that no bystanders were implicated when the raid commenced. Because Jones was arrested when the police conducted their raid, he was clearly present at the target residence that evening. The issue was whether he was knowingly present for a dogfight.

We have already determined that the State satisfied its burden of production on that issue based on the presence of the dogs, the behavior of the crowd, the clandestine nature of the event, and the large quantities of money that the crowd had on hand. *See* discussion, *supra*. Consequently, Jones cannot demonstrate prejudice as a result of Hollis' testimony that he saw Jones at the property that evening. His second assignment of error is overruled.

### III.

{¶34} Jones' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

SHUBHRA N. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.