[Cite as *State v. Calise*, 2012-Ohio-4797.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 26027 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| TIFFANI D. CALISE | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 10 08 2322 |

DECISION AND JOURNAL ENTRY

Dated: October 17, 2012

MOORE, Judge.

{¶1}    Defendant-Appellant, Tiffani Calise, appeals from her convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2}    Shortly before midnight on August 9, 2010, Ms. Calise called 911 and told the dispatcher that the child she was babysitting, Aaliyah Ali, had bumped her head and was unresponsive. Paramedics responded to the scene while Ms. Calise tried to perform CPR. When the paramedics arrived, they found Aaliyah lying unclothed on the living room floor of the apartment. Aaliyah was only breathing four to six times per minute and displayed decorticate posturing, a sign of brain injury. The paramedics transferred her to Akron Children's Hospital where doctors scanned her brain and performed brain surgery in an attempt to reduce serious swelling. It soon became clear, however, that even if Aaliyah survived she would remain in a persistent, vegetative state due to the extensive brain damage she had suffered. Aaliyah's

mother, Gabrielle Moneypenny, ultimately decided to discontinue life support, and Aaliyah succumbed to her injuries. At the time of her death, Aaliyah was 23 months old.

{¶3} According to Ms. Calise, Aaliyah was injured when she fell in Ms. Calise's bathtub. Ms. Calise told the police that she decided to bathe Aaliyah and her own daughter sometime after she fed both girls at approximately 10:30 p.m. She bathed her daughter first while Aaliyah watched and played. Ms. Calise then removed her daughter from the bath, emptied the tub, and refilled it for Aaliyah. When Ms. Calise finished bathing Aaliyah, she lifted the drain and stood Aaliyah in the tub. She then realized that she did not have a towel for Aaliyah, so she walked out of the bathroom to get one. After she left the bathroom, Ms. Calise heard three loud thumps. She returned to the bathroom to find Aaliyah lying unconscious in the bathtub. At that point, she carried Aaliyah into the living room and dialed 911.

{¶4} Aaliyah's CT scans and autopsy revealed that she had suffered a subdural hemorrhage on the right-side of her brain, severe swelling that had caused her brain to shift out of place, and bilateral retinal hemorrhaging. Two of the doctors who treated Aaliyah compared her injuries to those generally observed in traumatic impact situations such as high speed motor vehicle accidents or falls from multiple stories. The Summit County Medical Examiner ultimately determined that Aaliyah died from complications of blunt impact trauma as a result of shaking and ruled her death a homicide. The three doctors who evaluated Aaliyah after she came to Akron's Children Hospital and the Medical Examiner who performed her autopsy all concluded that Aaliyah's injuries were not consistent with a bathtub fall and were the result of severe trauma.

{¶5} A grand jury indicted Ms. Calise on the following counts: (1) murder, in violation of R.C. 2903.02(B); (2) involuntary manslaughter, in violation of R.C. 2903.04(A); and (3) two

counts of child endangering, in violation of R.C. 2919.22(A) and 2919.22(B)(1). Both the defense and the State consulted with expert witnesses during the discovery process. In particular, the defense consulted with Dr. John Lloyd, a Ph.D. in ergonomics. Dr. Lloyd agreed to conduct an experiment to determine whether a child of Aaliyah's size could have sustained a traumatic brain injury by slipping and falling in a bath tub.

{¶6} Dr. Lloyd's experiment and conclusions led the State to file a motion in limine to exclude his testimony from trial. The court conducted a *Daubert* hearing and also permitted the parties to submit written arguments after the hearing. On May 16, 2011, the court issued a written opinion in which it concluded that Dr. Lloyd would not be permitted to testify. Specifically, the court held that (1) Dr. Lloyd's expertise in his field did not qualify him to render a medical opinion as to the types of medical conditions or brain injuries Aaliyah could have sustained from a bath tub fall, and (2) the experiment Dr. Lloyd conducted did not withstand the strictures of *Daubert* and Evid.R. 702.

{¶7} A jury trial commenced, at the conclusion of which the jury found Ms. Calise guilty on all counts. On June 27, 2011, the trial court sentenced Ms. Calise to a total of fifteen years to life in prison. Ms. Calise filed a motion for a new trial and appealed from her convictions before the trial court ruled on her motion. This Court stayed the appeal and granted Ms. Calise's request to remand the matter for the purpose of permitting the trial court to rule on her motion for a new trial. After the court denied her motion, Ms. Calise filed a motion with this Court to supplement the record with the trial court's ruling as well as to amend her notice of appeal to include the ruling. This Court granted both motions by way of journal entry.

{¶8} Ms. Calise's appeal is now before this Court. She raises nineteen assignments of error, many of which we consolidate or rearrange for ease of analysis.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN EXCLUDING THE TESTIMONY OF DR. JOHN LLOYD.

{¶9}    In her first assignment of error, Ms. Calise argues that the trial court abused its discretion by excluding the testimony of Dr. John Lloyd.  We disagree.

{¶10}  Evid.R. 702 governs the admissibility of expert testimony.  *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 610 (1998).  The rule provides:

> A witness may testify as an expert if all of the following apply:
>
>  (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
>  (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
>
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Evid.R. 702.  "The qualification and reliability requirements of Evid.R. 702 are distinct. Because even a qualified expert is capable of rendering scientifically unreliable testimony, it is imperative for a trial court, as gatekeeper, to examine the principles and methodology that underlie an expert's opinion."  *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 17.

"In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller* at 611, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-594 (1993). The focus must be on whether the expert's opinion is based "upon scientifically valid principles." *Miller* at paragraph one of the syllabus. *Accord State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998) ("The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth.").

{¶11} Ms. Calise sought to have Dr. Lloyd testify as an expert in biomechanics, the study of the application of mechanics and Newtonian principles to biological systems such as humans. Had the court permitted Dr. Lloyd to testify, he would have opined that it was possible for a bathtub fall to have produced the type of head injuries that Aaliyah sustained. Dr. Lloyd reached that conclusion by conducting an experiment, which he described in detail at the *Daubert* hearing.

{¶12} Dr. Lloyd purchased a porcelain bathtub from a local Home Depot and placed the bathtub in his home laboratory. He then prepared a 22 lb. CRABI1 biofidelic mannequin for his experiment, adding two pounds to the mannequin's torso to approximate Aaliyah's weight and installing several force sensors to the mannequin's head. Dr. Lloyd also prepared electronic equipment to record the fall sequences that he conducted and to receive data from the force sensors mounted inside the mannequin's head.

{¶13} Once Dr. Lloyd placed the mannequin in the bathtub, he used an electromagnet to hold the mannequin in a standing position. Dr. Lloyd then interrupted the power to the magnet

to allow the mannequin to fall. Due to the fact that the mannequin had rubberized feet, however, the mannequin did not always fall. To rectify this problem, Dr. Lloyd purchased roller skates for the mannequin at Build-a-Bear. The roller skates added height to the mannequin, which brought it closer to Aaliyah's actual height. Dr. Lloyd also testified that, by using the roller skates, he was better able to simulate a slip event in the bathtub.

{¶14} Dr. Lloyd ultimately conducted 25 data collection trials during which he allowed the mannequin to fall from three different positions: a standing fall, a fall that occurred "while initiating egress from [the] bathtub," and a fall "from [the] top edge of [the] bathtub." Dr. Lloyd recorded the data he received from each fall and inserted the data into force calculations to arrive at values representing the force with which the mannequin's head made impact when it fell. He then compared the force values his experiment produced with head injury threshold criteria and determined that the values he recorded exceeded the reported thresholds. Because the values he recorded exceeded the reported thresholds, he concluded that it was possible a bathtub fall could have produced the type of head injuries that Aaliyah sustained.

{¶15} The trial court excluded Dr. Lloyd's testimony on two separate bases. First, the court determined that Dr. Lloyd was not qualified to offer any opinion as to whether specific types of brain injuries in a child could be sustained by a bathtub fall because he lacked any education, training, or experience in pediatric brain injury and any such testimony would amount to a medical diagnosis that Dr. Lloyd was not qualified to make. *See* Evid.R. 702(B). Second, the court determined that Dr. Lloyd's bathtub experiment was not reliable because it had never been tested or subjected to peer review, no error rate was discussed, no proof existed that the experiment was definite enough to generate accurate results, and the methodology Dr. Lloyd

employed was not widely accepted in the scientific community. *See* Evid.R. 702(C). We begin by examining the reliability of Dr. Lloyd's experiment under Evid.R. 702(C).

{¶16} Dr. Lloyd admitted on cross-examination that he created and designed the bathtub experiment he conducted for the sole purpose of this litigation. He explained that he performed the experiment in his private lab at home because it was unrelated to his actual employment as a researcher for the James A. Haley Veterans Hospital in Florida. Dr. Lloyd testified that he advertises his services on the internet and performs experiments during his personal time. He began studying abusive head trauma in children approximately 14 months before the *Daubert* hearing when a colleague sought his opinion in a Shaken Baby Syndrome case. Since that time, Dr. Lloyd had performed five experiments related to Shaken Baby Syndrome.[1] He had never, however, performed the type of experiment that he designed in this case.

{¶17} Dr. Lloyd testified that biofidelic mannequins such as the CRABI1 model are used in the automotive industry to simulate car accidents and determine the likelihood of injury to the occupants of a car. He testified that guidelines exist for the installation and calibration of the electronic instrumentation used with the mannequins and that he followed those guidelines in installing the CRABI1 model's sensors. Dr. Lloyd indicated that it is a generally accepted principle in the scientific community that simulations during which force is applied can be used to determine the likelihood of injuries. He further stated that the methodology he employed in his experiment is commonly used in the motor vehicle industry as well as the sporting goods industry, where force simulations are used to test the effectiveness of sporting equipment at preventing injury. Finally, Dr. Lloyd testified that the injury thresholds he used in his

---

[1] Dr. Lloyd testified that he had proven through biomechanical analysis that shaking alone is insufficient to cause brain injury to an infant.

calculations are widely used in the automotive industry and many articles have been published about them.

{¶18} Dr. Lloyd admitted that CRABI1 mannequins were specifically developed to study impact biomechanics in motor vehicle accidents and that the injury thresholds upon which he relied were developed for automotive impact testing. Nevertheless, Dr. Lloyd claimed that the same mannequins and threshold data from the automotive industry could be applied to simulated fall experiments because the principles of biomechanics, physics, and gravity apply equally to any instance of force. Dr. Lloyd explained that one would simply need to adjust their calculations to account for any differences, such as the difference between a vertical and horizontal impact or the difference between an adult's and a child's injury threshold. Dr. Lloyd relied upon two experiments as examples of the soundness of his methodology and the experiment he performed.

{¶19} The first experiment Dr. Lloyd referenced was one in which he and a colleague dropped adult-sized biofidelic mannequins from a hospital bed from varying heights and positions in order to study the risk of any injury that might result and how to prevent the injury. The results of the experiment allowed Dr. Lloyd to determine whether the risks of severe head injuries increased or decreased based upon the type of fall that occurred as well as how much those risks could be reduced by the presence of a bedside floor mat. Dr. Lloyd calculated the likelihood of injury in each fall by referring to the same head injury threshold criteria sources he used in this case. He and his colleague discovered that the risk of head injury was highest when they dropped a mannequin in an angular fashion with its feet hitting the floor before its head because the additional momentum attained as a result of the angular, as opposed to only linear,

acceleration strengthened the force of the impact. Dr. Lloyd testified that he and his colleague published the results of their experiment in a peer reviewed journal.

{¶20} The second experiment Dr. Lloyd referenced was one in which Dr. Chris Van Ee and his colleagues performed a biomechanical recreation of a child's fall from play equipment in her family's garage. In the recreation, Dr. Van Ee used a biofidelic mannequin to simulate the child's fall. Dr. Van Ee was able to recreate the fall and the conditions of the fall exactly, as the child's grandmother had been videotaping the child when she fell and a recording of the fall existed. Based on the recreation he conducted, Dr. Van Ee determined that the fall the child took was sufficient to cause the types of injuries that the child sustained. Dr. Lloyd specified that Dr. Van Ee's study had been published and peer-reviewed and that the methodology Dr. Lloyd used for his own experiment was "almost identical" to the methodology that Dr. Van Ee had used.

{¶21} Dr. Lloyd admitted on cross-examination that he had not submitted the results of his bathtub experiment for publication and that he had only discussed his experiment with one other person: a pathologist friend with whom he had dinner a few weeks before the *Daubert* hearing. He further admitted that, unlike the experiment Dr. Van Ee conducted, no recording of the fall he sought to simulate, if in fact there was a fall, existed. Dr. Lloyd was forced to create three different fall scenarios and average his results because no one had witnessed the alleged fall. Moreover, Dr. Lloyd conceded that he had not ensured the conditions of his experiment were the same as the conditions that existed on the night of Aaliyah's injuries. Dr. Lloyd never visited the actual apartment or bathtub where Aaliyah allegedly fell. He did not know what type of bathtub the apartment had or whether the bathtub he had purchased was the same type. He did not know how much water, if any, remained in the bathtub when Aaliyah allegedly fell. Moreover, he did not explain how accurately a pair of roller skates could simulate a fall

condition when, in actuality, any fall would have occurred in bare feet. Even so, Dr. Lloyd insisted that any inaccuracies or variations in the conditions of his experiment only would have produced more conservative results.

{¶22} Neither one of the experiments to which Dr. Lloyd referred as support for his methodology are comparable to the bathtub experiment he performed. The experiment conducted by Dr. Van Ee reportedly constituted an exact recreation of the fall in question, as a recording of the fall and the conditions of the fall existed. Likewise, the experiment that Dr. Lloyd and one of his colleagues conducted involving mannequins dropped from beds only sought to measure risks of injury by comparing repetitive falls under similar conditions. The experiment did not encompass the comparison of the results of one of those falls with an injury from an unknown cause. Although Dr. Lloyd may have premised the calculations in his experiment upon widely accepted theories, the use of a widely accepted theory is only one component of reliability under Evid.R. 702(C). *See* Evid.R. 702(C)(1).

{¶23} Dr. Lloyd designed the bathtub experiment he conducted by himself solely for purposes of this litigation. He admitted that no one else had ever performed the experiment he created. He also admitted that his experiment and his results had not been published or subjected to any type of peer review, other than Dr. Lloyd's having discussed the experiment with a friend over dinner. Moreover, Dr. Lloyd conceded that he did not have any knowledge of the actual conditions of the apartment or bathtub in which Aaliyah allegedly fell or the exact nature of her alleged fall. *Compare Miller*, 80 Ohio St.3d at 612-616.

{¶24} In affirming a decision to exclude expert testimony, the Ohio Supreme Court wrote:

> Although scientists certainly may draw inferences from a body of work, trial courts must ensure that any such extrapolation accords with scientific principles

> and methods. * * * A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. Because expert opinion based on nebulous methodology is unhelpful to the trier of fact, it has no place in courts of law.

(Internal quotations and citations omitted.) *Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 18. Although Dr. Lloyd used several widely accepted theories in his experiment, we cannot conclude that the trial court abused its discretion when it determined that his experiment was not reliable. The experiment had never before been performed, so Dr. Lloyd's technique had never been tested. *See Miller*, 80 Ohio St.3d at 611. Likewise, his technique had never been subjected to peer review. *See id.* The only mention of any known or potential rate of error Dr. Lloyd discussed at the hearing was the known error rate for the calibration of the sensors he installed in the CRABI1 mannequin. No known or potential rate of error was discussed with regard to any other instruments he used or any other component of his experiment. *See id.* Finally, other than the limited examples Dr. Lloyd gave of the two experiments that were not comparable with his own, there was no evidence that the methodology he used had gained general acceptance in the scientific community. *See id.* In short, Ms. Calise did not demonstrate at the *Daubert* hearing that Dr. Lloyd's testimony was scientifically reliable. *See State v. Wooden*, 9th Dist. No. 23992, 2008-Ohio-3629, ¶ 23-24. To the extent Ms. Calise argues in her brief that a law degree does not equip one to question principles and methods acted upon by experts in their relevant fields, we abide by the Supreme Court's cautionary instruction that the "courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Valentine* at ¶ 23, quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996). Accordingly, we conclude that the trial court did not abuse its discretion when it determined that Dr. Lloyd's testimony was not scientifically reliable under Evid.R. 702(C).

{¶25} The trial court also determined that Dr. Lloyd was not qualified to offer any opinion as to whether specific types of brain injuries in a child could be sustained by a bathtub fall because he lacked any education, training, or experience in pediatric brain injury and any such testimony would amount to a medical diagnosis that Dr. Lloyd was not qualified to make. *See* Evid.R. 702(B). We will not address this portion of the trial court's opinion in our analysis because Ms. Calise has not set forth any argument that the court erred by so concluding. *See* App.R. 16(A)(7). As this Court has repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. No. 18349, 1998 WL 224934, *8 (May 6, 1998). Ms. Calise's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN ALLOWING THE STATE'S MEDICAL WITNESSES TO TESTIFY AS EXPERTS ON THE FORCE NECESSARY TO CAUSE THE INJURIES SUFFERED BY AALIYAH ALI.

{¶26} In her third assignment of error, Ms. Calise argues that the trial court erred when it allowed the State's medical witnesses to testify that Aaliyah's injuries could not possibly have been caused by a bathtub fall. According to Ms. Calise, three of the State's medical witnesses were not competent to testify as to the cause of an injury.

{¶27} "The determination of the admissibility of expert testimony is within the discretion of the trial court." *Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 9. The trial court permitted the State to present the testimony of four medical experts: (1) Dr. Nirali Patel, a pediatric emergency medicine fellow at Akron Children's Hospital; (2) Dr. John Pope, a pediatric intensivist and the associate director of the pediatric critical care unit at Akron Children's Hospital; (3) Dr. Richard Daryl Steiner, the director of the CARE Center at Akron

Children's Hospital; and (4) Dr. Dorothy Dean, a forensic pathologist and the Summit County Medical Examiner. All four witnesses testified, within a reasonable degree of medical certainty, that the cause of Aaliyah's death was non-accidental head trauma and that her injuries were not consistent with having slipped and fallen in a bathtub. All four witnesses based their conclusions on their training, education, experience, and their personal evaluations of Aaliyah.

{¶28} Ms. Calise argues that Drs. Patel, Pope, and Steiner were not competent to opine as to the cause of Aaliyah's injuries because "that is just not their field." She fails to point to any authority in support of her argument. *See* App.R. 16(A)(7). Moreover, she does not challenge any of the three experts' particular qualifications or explain why, as medical doctors with pediatric experience who personally examined Aaliyah, they were not competent to testify as to the cause of her injuries. *See, e.g., Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 18-19 (9th Dist.). This Court will not construct an argument on behalf of an appellant. *See Cardone*, 1998 WL 224934, at *8. Further, this Court will not conclude that an appellant was prejudiced by the admission of evidence where the appellant has not shown that such prejudice exists. Ms. Calise does not explain how the testimony of the three doctors harmed her in light of Dr. Dean's testimony. Dr. Dean performed Aaliyah's autopsy and concluded, within a reasonable degree of medical certainty, that Aaliyah died from blunt impact trauma and her injuries were "[a]bsolutely not" consistent with a fall in a bathtub. Ms. Calise has not challenged Dr. Dean's competence to offer the foregoing conclusions, and the testimony of the other medical doctors merely corroborated those conclusions. Ms. Calise's third assignment of error is overruled.

**ASSIGNMENT OF ERROR XI**

THE TRIAL (sic) ERRED IN EXCLUDING A NEWLY-PROFFERED EXPERT OPINION FROM DR. PETER STEPHENS, WHO WOULD HAVE TESTIFIED THAT AALIYAH'S INJURY GAVE EVIDENCE OF BEING AN OLD ONE.

**{¶29}** In her eleventh assignment of error, Ms. Calise argues that the trial court erred by prohibiting defense expert Dr. Peter Stephens from testifying that pre-existing injuries, aggravated by a fall in Ms. Calise's bathtub, could have been the cause of Aaliyah's death. We disagree.

**{¶30}** Although a criminal defendant has the right to present witness testimony on his behalf, a trial court may "exclude such evidence when the orderly administration of justice is threatened by the accused's failure to promptly disclose witnesses." *State v. Moon*, 74 Ohio App.3d 162, 169 (9th Dist.1991). The rules of discovery, and more specifically Crim.R. 16, imbue trial courts with the discretion to exclude testimony that is not disclosed in a timely manner in order to prevent surprise and ensure a fair trial. *State v. Barrios*, 9th Dist. No. 06CA009065, 2007-Ohio-7025, ¶ 18. "Exclusion is a permissible sanction 'as long as it would not completely deny the defendant his constitutional right to present a defense.'" *Id.*, quoting *State v. Sinkfield*, 2d Dist. No. 18663, 2001 WL 1517314, *8 (Nov. 30, 2001). Because a trial court's decision to exclude testimony is a discretionary one, we review a court's decision to exclude evidence under an abuse of discretion standard of review. *Barrios* at ¶ 18. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶31}** Dr. Stephens prepared two expert reports on behalf of the defense. The actual reports are not a part of the record, but the parties and the court summarized their contents. In his first report, Dr. Stephens opined that Aaliyah's injuries were consistent with her having fallen

in Ms. Calise's bathtub. Dr. Stephens theorized that all of Aaliyah's injuries were the result of the onset of rapid brain swelling, triggered by an impact. In his second report, however, Dr. Stephens opined that slides taken from Aaliyah's autopsy evidenced the presence of older blood, meaning that Aaliyah had suffered a head injury before the injuries she sustained while in Ms. Calise's care. Dr. Stephens theorized that pre-existing injuries Aaliyah sustained, possibly at the hands of another, could have caused her death with or without additional trauma, such as a fall in the bathtub. Defense counsel produced Dr. Stephens' first report before the expiration of the discovery deadline that the trial court set for the parties. Defense counsel produced Dr. Stephens' second report on the morning of trial.

{¶32} The State objected to Dr. Stephens' second report on the basis that it amounted to a new defense, premised upon a theory of old abuse at the hands of someone other than Ms. Calise. Defense counsel countered that the second report was consistent with the State's own evidence, as the first technician who reviewed Aaliyah's original CT scan had reported that the scan showed old blood. In doing so, defense counsel admitted that the State had provided the defense with all of Aaliyah's medical records, including the first technician's report, and her autopsy slides in a timely manner.

{¶33} The trial court determined that Dr. Stephens' second report amounted to a new defense theory and that it would be unfair to allow Ms. Calise to present her expert's new theory to the jury when the State had just learned of it on the morning of trial. The court noted that the State had provided defense counsel with all of Aaliyah's medical records in a timely manner, such that defense counsel had adequate time to prepare any defense theories premised upon them. The court ruled that the testimony of Dr. Stephens would be limited to the contents of his first expert report. Nevertheless, the court allowed the defense to question the State's experts

about the presence of old blood on Aaliyah's CT scan and what effect, if any, a prior head injury would have had on their diagnoses. The court also ruled that Ms. Calise could present lay witness testimony to introduce the alternative theory of prior abuse if she chose to do so. The court simply limited her from introducing expert testimony based on a report submitted on the day of trial.

{¶34} Ms. Calise concedes that she failed to disclose Dr. Stephens' second expert report within the discovery deadline that the court set, but argues that the court should have granted a continuance instead of excluding the testimony based upon the second report. At that point, however, the trial court already had granted a continuance at the request of the defense due to a different issue defense counsel perceived with the State's experts. Moreover, at that point, the potential jurors were at the courthouse waiting to be seated, and there was no guarantee that a continuance would have resolved the situation. As the trial court noted, the theory that Aaliyah died primarily as a result of prior abuse was not the theory that the defense had pursued and for which the State had prepared up to that point. *See Lakewood v. Papadelis*, 32 Ohio St.3d 1, 5 (1987) ("Factors to be considered by the trial court include the extent to which the prosecution will be surprised or prejudiced by the witness' testimony * * *."). The theory represented a considerable tactical shift on the morning of trial.

{¶35} Given our review of the record, we cannot conclude that the trial court abused its discretion by excluding Dr. Stephens' testimony to the extent it encompassed his second report. Defense counsel presented the report at the last moment, despite the fact that the State had produced all of Aaliyah's medical records in a timely manner. The justification defense counsel offered for the delay in seeking the second expert report was that the State had allegedly withheld evidence about possible abuse. According to defense counsel, the State never disclosed

in discovery the fact that the police had received, but had never investigated, phone calls about the possible abuse of Aaliyah by her mother. Ms. Calise maintains on appeal that the State's nondisclosure violated *Brady v. Maryland*, 373 U.S. 83 (1963), and compounded the prejudice that resulted from the trial court's ruling to exclude Dr. Stephens' testimony.

**{¶36}** Initially, we note that the State did not violate *Brady v. Maryland*. Ms. Calise informed the trial court that she became aware of other possible acts of abuse toward Aaliyah the week before trial. "*Brady* only applies when a defendant discovers post-trial that the State has withheld exculpatory evidence." *State v. Vu*, 9th Dist. No. 11CA0042-M, 2012-Ohio-746, ¶ 39. Because Ms. Calise learned about the allegedly exculpatory evidence at issue before trial, no *Brady* violation occurred. Further, as defense counsel conceded in the court below, the defense had access to all of Aaliyah's medical records, including the first technician's report that her CT scan depicted old blood, long before defense counsel sought to introduce expert testimony about the old blood. Defense counsel, therefore, could have formulated the theory about a prior injury based upon the information the State disclosed in discovery.

**{¶37}** Ms. Calise has not shown that the trial court abused its discretion. The court excluded expert testimony in order to avoid unfair surprise and to ensure a fair trial. *See Barrios*, 2007-Ohio-7025, at ¶ 18. Additionally, the court's ruling did not completely deny Ms. Calise her constitutional right to present a defense. *See id.* It merely prohibited Ms. Calise from presenting expert testimony on a belated, alternative theory. Further, Ms. Calise was still able to introduce that theory through cross-examination. Ms. Calise's eleventh assignment of error is overruled.

**ASSIGNMENT OF ERROR XIII**

THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF SHELBY POMPEO AND GRETCHEN ROTHACHER.

{¶38} In her thirteenth assignment of error, Ms. Calise argues that the trial court erred by admitting the testimony of two witnesses: Shelby Pompeo and Gretchen Rothacher. Ms. Calise argues that the testimony of both women amounted to inadmissible character evidence. We disagree.

{¶39} The trial court permitted both Ms. Pompeo and Ms. Rothacher, two of Ms. Calise's former neighbors, to testify that they saw Ms. Calise outside her apartment with Aaliyah the same night Aaliyah died, heard Ms. Calise yell at Aaliyah, and watched her roughly grab Aaliyah by the back of the neck and drag her back inside. Ms. Rothacher could not remember what Ms. Calise had yelled, but Ms. Pompeo testified that Ms. Calise yelled "[w]e're going in the f***ing house." Both Ms. Rothacher and Ms. Pompeo testified that the incident occurred at approximately 8:30 p.m., just over three hours before Ms. Calise called 911.

{¶40} Evid.R. 404(B) provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Initially, we question Evid.R. 404(B)'s applicability in this instance, as the rule only applies to "other crimes, wrongs, or acts." That is, we question whether the State actually sought to introduce evidence of another crime, wrong, or act through the testimony of Pompeo and Rothacher. *See State v. Owens*, 9th Dist. No. 21630, 2004-Ohio-601 ¶ 18 (Evid.R. 404(B) argument rejected because "[t]he evidence was not admitted to show a particular character trait of Defendant"). Nevertheless, we recognize that the Ohio Supreme Court has broadly construed Evid.R. 404(B), employing the rule to analyze a wide-range of testimony. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 65-92 (other acts testimony involving defendant's lack of parenting, poor housekeeping, and financial irresponsibility). As such, to the

extent Evid.R. 404(B) applies here, we conclude that the admission of the testimony of Ms. Pompeo and Ms. Rothacher did not violate the rule.

**{¶41}** Evid.R. 404(B) contains a non-exhaustive list of exceptions under which other acts evidence may be admitted for a purpose other than to show propensity. Certain other acts evidence also may be admissible when "the other acts 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment' and are 'inextricably related' to the crime." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 13, quoting *State v. Curry*, 43 Ohio St.2d 66, 73 (1975). "A jury is entitled to know the 'setting' of a case, including evidence of other crimes that explains the circumstances or tends logically to prove any element of the offense charged." *State v. Thomas*, 9th Dist. No. 10CA009756, 2011-Ohio-1629, ¶ 17. This Court reviews a trial court's admission of other acts evidence under an abuse of discretion standard of review. *Morris* at ¶ 14, quoting *Diar* at ¶ 66.

**{¶42}** Ms. Calise argues that the trial court abused its discretion by admitting the testimony of Ms. Pompeo and Ms. Rothacher because the testimony was not admissible under the mistake or accident exception contained in Evid.R. 404(B). Absence of mistake or accident was one basis that the trial court cited for its ruling. The court also determined, however, that the testimony was admissible because it was close in time to Aaliyah's injury and part of the background of the offense. Moreover, even if the trial court erred in its rationale, this Court may affirm its ultimate decision on other legally correct grounds. *State v. Scott*, 9th Dist. No. 08CA009446, 2009-Ohio-672, ¶ 16, quoting *State v. Danko*, 9th Dist. No. 07CA0070-M, 2008-Ohio-2903, ¶ 40.

**{¶43}** According to the defense, Ms. Calise had watched Aaliyah many times without incident, she enjoyed watching Aaliyah, she never would have harmed her, and Aaliyah's

injuries were the result of a freak accident. The incident that Ms. Pompeo and Ms. Rothacher described detracted from the defense's portrayal of the events and took place only a few hours before Aaliyah's injury. The incident tended to show that Ms. Calise was, at the very least, frustrated with Aaliyah shortly before her death, as evidenced by Ms. Calise grabbing her, roughly shoving her, and using profanity with her despite the fact that she was less than two years old. The testimony, if believed, would have helped to provide context for the jurors. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 72 ("Testimony that [the defendant] left [the victim] unattended, fed him fast food, and acted like [the victim] was a bother provided the context for the alleged crimes and made [the defendant's] actions more understandable to the jurors."); *Thomas*, 2011-Ohio-1629, at ¶ 17. Based on our review of the record, we must conclude that the testimony of Ms. Pompeo and Ms. Rothacher was admissible because it formed a part of the immediate background of Ms. Calise's offense. *See Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, at ¶ 13. As such, the trial court did not abuse its discretion by admitting the testimony. Ms. Calise's thirteenth assignment of error is overruled.

## ASSIGNMENT OF ERROR XV

THE TRIAL COURT ERRED IN FAILING TO GRANT A MOTION FOR MISTRIAL BASED ON JUROR MISCONDUCT.

{¶44} In her fifteenth assignment of error, Ms. Calise argues that the trial court erred by denying her motion for a mistrial. We disagree.

{¶45} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected. Great deference is afforded to a trial court's decision regarding a motion for mistrial. Accordingly, this Court reviews the denial of a motion for mistrial for an abuse of discretion."

(Internal citations, alterations, and quotations omitted.)  *State v. Howes*, 9th Dist. No. 24665, 2010-Ohio-421, ¶ 11. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling.  *Blakemore*, 5 Ohio St.3d at 219.

{¶46}  Ms. Calise moved for a mistrial the day after a jury view took place, during which the jurors visited an apartment identical to Ms. Calise's former apartment.  Before the jurors visited the apartment, the State requested for the trial court to instruct the jurors to touch the bathtub in the apartment.  The defense objected to that instruction, so the court indicated that it would modify it.  Instead of instructing the jurors that they had to touch the bathtub, the court instructed the jurors that they would be permitted to do so.  Ms. Calise requested a mistrial after the jury view because "many" of the jurors touched the bathtub and "start[ed] banging it in several places" before taking notes.  According to Ms. Calise, the court's ruling permitted the jurors to conduct their own experiment.

{¶47}  The trial court refused to grant a mistrial, but agreed to issue an instruction to the jury.  The court instructed the jury as follows:

> I wanted to give you a couple further instructions regarding the jury view that we had yesterday.
>
> You were taken to the premises or scene and what you * * * observed at the scene is not evidence since the conditions may have changed.  In fact, I think we informed you that perhaps some of the conditions did change since the time of the events in this case.
>
> The evidence as to the physical appearance of the scene must come to you from the witness stand.  The sole purpose of the viewing of the scene is to help you understand the evidence as it is presented during the trial.
>
> So I just wanted to make sure that you were aware of that.  Evidence, actual evidence in this case, has to come from the witness stand or the exhibits.  And we just did that to help aid you in understanding the evidence as it comes in * * *.

Thus, the trial court specifically told the jurors that they were not to consider any of the conditions they observed during their jury view as evidence.

{¶48} Ms. Calise does not reference the court's instruction in her argument that the court allowed the jurors to conduct their own experiment. Yet, the court's instruction specifically addressed that issue. This Court presumes that jurors follow the instructions of the trial court. *State v. Veal*, 9th Dist. No. 26005, 2012-Ohio-3555, ¶ 28. Given that the trial court specifically instructed the jury that they were not to consider any part of their jury view as actual evidence in the case, we must presume that the jurors did not do so. *Id.* Further, we must conclude that Ms. Calise's substantial rights were not adversely affected. Ms. Calise has not set forth any argument as to how she was prejudiced by the jury's conduct in light of the other evidence the State introduced at trial. *See* App.R. 16(A)(7). Because the court instructed the jury regarding the jury view and Ms. Calise has not shown that she was prejudiced by it in light of the other evidence introduced at trial, we conclude that the trial court did not abuse its discretion by refusing to grant a mistrial. *See, e.g., State v. Mohamed*, 9th Dist. No. 11CA0050-M, 2012-Ohio-3636, ¶ 27. As such, Ms. Calise's fifteenth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED IN FAILING TO GRANT [MS. CALISE'S] MOTIONS FOR ACQUITTAL.

## ASSIGNMENT OF ERROR VI

THE COURT ERRED IN ENTERING JUDGMENT ON THE VERDICT BECAUSE IT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶49} In her fifth and sixth assignments of error, Ms. Calise argues that the court erred by denying her motion for acquittal and that her convictions are based on insufficient evidence. We disagree.

{¶50} "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Frashuer*, 9th Dist. No. 24769, 2010-

Ohio-634, ¶ 33. In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶51} Ms. Calise does not challenge any particular element of her convictions. Instead, she argues that reasonable doubt that she harmed Aaliyah existed because one of the State's own experts acknowledged that (1) shaking injuries are difficult to diagnosis absent a witness to the shaking, (2) Aaliyah did not suffer from several of the injuries commonly associated with shaking, such as rib fractures, and (3) studies have cast doubt on the legitimacy of shaken-baby syndrome. We do not agree that Ms. Calise's convictions are based on insufficient evidence.

{¶52} Summit County Sheriff's Deputy Scott Plymire responded to Ms. Calise's 911 call and arrived at her apartment along with paramedics from the City of Green's Fire Department. Deputy Plymire spoke with Ms. Calise after Aaliyah received treatment. Ms. Calise told Deputy Plymire that Aaliyah was injured at the end of her bath when Ms. Calise briefly left the room to get a towel. According to Ms. Calise, she heard three "thump[s]" after she left the bathroom and returned to find Aaliyah lying limp on the floor of the bathtub. Ms. Calise stated that the water in the tub had "nearly drained" at that point and Aaliyah was

positioned on her back with her arms over her head. Ms. Calise then grabbed Aaliyah and brought her into the living room where she called 911.

{¶53} Thomas Wiles was one of the paramedics who treated Aaliyah at the scene. Mr. Wiles testified that Aaliyah was lying unclothed on Ms. Calise's living room floor when he arrived and displayed decorticate posturing. Mr. Wiles explained that decorticate posturing indicates a head injury and is typically associated with motorcycle crashes or high speed motor vehicle accidents. At the time Mr. Wiles began to treat Aaliyah, her pupils were fixed and dilated and she was only breathing four to six times per minute. The paramedics used a bag valve mask to aid Aaliyah's respirations. Mr. Wiles could not actually see inside of Aaliyah's mouth because her teeth were clenched. He indicated, however, that he was easily able to squeeze the bag he placed on Aaliyah's face, meaning that he did not encounter any obstructions in her airway that would have made bagging difficult.

{¶54} The State presented four medical experts at trial: Dr. Nirali Patel, Dr. John Pope, Dr. Richard Daryl Steiner, and Dr. Dorothy Dean. Dr. Patel first examined Aaliyah when she arrived at Akron Children's Hospital. At that time, Aaliyah was in critical condition and required intubation. Dr. Patel testified that she administered a drug to Aaliyah to paralyze her jaw muscles so that she could open her mouth and complete the intubation. She further testified that, although she had to suction foreign material from Aaliyah's throat before successfully completing the intubation, Aaliyah did not have any airway blockages.

{¶55} Dr. Patel only observed a small bruise on Aaliyah's forehead when she examined her, but ordered a CT scan. The CT scan displayed a subdural hemorrhage, cerebral edema, and mass effect swelling in Aaliyah's brain. It further showed that Aaliyah did not have any skull fractures. Dr. Patel opined that a skull fracture generally would occur with a traumatic impact

situation and that the type of injuries Aaliyah sustained were usually seen in high impact, acceleration-deceleration situations such as motor vehicle accidents or falls from a great height. Dr. Patel testified that she had never seen a slip and fall injury result in the types of injuries that Aaliyah sustained and that Aaliyah's injuries were not proportional to the reported history the hospital received from Ms. Calise. Dr. Patel opined, based on a reasonable degree of medical certainty, that Aaliyah's injuries were the result of non-accidental trauma, not injuries associated with either a bathtub fall or choking.

{¶56} Dr. Pope received Aaliyah into his care before her surgery. At that time, Aaliyah displayed signs of a severe brain injury. Dr. Pope received the results of Aaliyah's blood tests and testified that her lactic acid levels were normal. Dr. Pope explained that oxygen deprivation causes lactic acid build-up, such that Aaliyah's levels would have been elevated if she had been significantly deprived of oxygen or blood flow. Dr. Pope reviewed Aaliyah's CT scan and noted that her injuries were of a type typically seen in a severe car crash situation or a fall from a second or third story window. Dr. Pope noted that he did not observe any exterior impact injuries on Aaliyah and that falls generally present with outside injuries, fractures, or epidural hematomas. He opined that Aaliyah's injuries did not match the history given and, based on a reasonable degree of medical certainty, they were the result of a violent force.

{¶57} Dr. Steiner testified that he evaluated Aaliyah and her case for signs of abuse in his capacity as the Director of the CARE Center. Based on his examination of Aaliyah and his review of all of her medical records, Dr. Steiner concluded that Aaliyah had suffered physical abuse that resulted in traumatic brain injury and, ultimately, her death. Dr. Steiner explained that the history Ms. Calise gave was incongruent with the injuries he observed on Aaliyah, as she had not suffered from any scalp bruising or contusions, she did not suffer any skull fractures (a

common injury in an impact situation), and her condition deteriorated rapidly. Dr. Steiner further explained that Aaliyah suffered from retinal hemorrhages, an injury indicative of a rotational acceleration-deceleration, whiplash-type injury. Although Dr. Steiner admitted that it was possible for a child to sustain a serious head injury from a short fall, he opined that such injuries were very rare. He testified that Aaliyah's particular injuries were not consistent with a slip and fall due to their violent and complex nature. Dr. Steiner opined, within a reasonable degree of medical certainty, that Aaliyah suffered an acute injury from physical abuse. More specifically, he concluded that Aaliyah died as the result of her head being violently and repetitively whipped back and forth.

{¶58} Dr. Dean performed Aaliyah's autopsy and ruled Aaliyah's death a homicide. Dr. Dean testified that Aaliyah did not present with any underlying health problems and that there was no evidence that she had ever experienced brain bleeding before this event. According to Dr. Dean, Aaliyah died as a result of complications of blunt impact trauma and had suffered severe damage as a result of severe trauma. Dr. Dean opined, based on a reasonable degree of medical certainty and the types of injuries Aaliyah had sustained, that Aaliyah had been shaken to death. More specifically, Dr. Dean testified that Aaliyah's brain "was slammed inside her skull forcibly" whether by shaking alone or shaking in conjunction with some impact on a surface. Dr. Dean opined that a bathtub fall could "[a]bsolutely not" have caused Aaliyah's severe brain damage.

{¶59} The State presented evidence that Ms. Calise was the only adult with Aaliyah at the time she suffered severe brain injuries. Further, the State presented extensive expert medical testimony that Aaliyah's injuries were the result of non-accidental trauma and could not possibly have occurred from the simple fall in the bathtub that Ms. Calise described. Although Dr.

Steiner admitted that it was possible in some instances for a short fall to produce a serious head injury, he testified that Aaliyah's specific injuries were not consistent with that type of fall. Ms. Calise criticizes Dr. Steiner's expert opinion on the basis that he admitted he would not diagnose an injury as shaken-baby syndrome in the absence of eyewitness testimony. What Dr. Steiner actually said, however, was that he would not conclude that injuries were purely the result of shaking, and not some other combination of injury such as shaking and impact, without additional evidence. There was also testimony that, although Aaliyah did not suffer some of the injuries commonly associated with shaking, such as rib fractures, she did suffer from another common injury, retinal hemorrhaging.

{¶60} Viewing all of the evidence in a light most favorable to the State, including the extensive expert medical testimony the State produced, a rational trier of fact could have found that the State proved its case against Ms. Calise beyond a reasonable doubt. All of the State's experts opined, within a reasonable degree of medical certainty, that Aaliyah's injuries were not the result of accidental trauma. Dr. Dean in particular testified that Aaliyah died from violent shaking. Ms. Calise's statement that Aaliyah was injured when she fell in the bathtub did not comport with the medical evidence the State produced at trial. Based on our review of the record, we conclude that Ms. Calise's convictions are not based on insufficient evidence. Ms. Calise's fifth and sixth assignments of error are overruled.

### ASSIGNMENT OF ERROR VIII

THE TRIAL COURT ERRED IN ENTERING JUDGMENT ON A VERDICT
THAT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶61} In her eighth assignment of error, Ms. Calise argues that the jury's verdicts are against the manifest weight of the evidence. We disagree.

{¶62} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other.  *Thompkins*, 78 Ohio St.3d at 387.  Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.  *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  *See also Otten*, 33 Ohio App.3d at 340.

{¶63} Ms. Calise argues that her convictions are against the manifest weight of the evidence because there was testimony that a short fall can produce a fatal head injury.  Again, Ms. Calise points to Dr. Steiner's testimony, in which he admitted that serious head injuries from short falls are possible.  Dr. Steiner also testified, however, that Aaliyah's particular injuries were not the result of a short fall even if such a possibility generally exists.  He specified that Aaliyah did not suffer any injuries that would commonly be associated with short falls, such as a skull fracture or scalp bruising or contusions.  Further, he specified that the totality of Aaliyah's injuries, including her retinal hemorrhaging, evidenced that she was subjected to a rotational acceleration/deceleration, whiplash injury and not a fall.  All of the State's other medical experts also concluded that Aaliyah's injuries were not the result of a fall in a bathtub.

**{¶64}** The defense presented two medical experts: Dr. Ronald Uscinski and Dr. Peter Stephens. Dr. Uscinski, a clinical neurosurgeon, testified within a reasonable degree of medical certainty that Aaliyah's injuries were consistent with the history Ms. Calise gave. Dr. Uscinski explained that all of Aaliyah's injuries could have been the result of intracranial pressure and swelling due to choking and oxygen deprivation. Dr. Uscinski disagreed with the State's expert, Dr. Pope, that blood testing always would reveal oxygen deprivation due to lactic acid build-up and related organ damage. Nevertheless, Dr. Uscinski admitted on cross-examination that there was no evidence that Aaliyah's airway had been blocked for any length of time. To the contrary, both the paramedics and the hospital staff who first treated Aaliyah were able to penetrate her airway with ease.

**{¶65}** Dr. Stephens agreed that Aaliyah's injuries were consistent with the history that Ms. Calise gave and that an impact could have disrupted Aaliyah's breathing pattern, which then could have triggered oxygen deprivation and swelling. Dr. Stephens also opined that retinal hemorrhaging is consistent with both abusive and accidental trauma, as it can be caused simply by the brain swelling. Dr. Stephens testified at length about the possibility of severe head injuries in short fall situations and the fact that it is possible for a child to suffer severe brain damage from a short fall in the absence of any external marks or bruises. Dr. Stephens concluded that Aaliyah died as the result of a fall.

**{¶66}** The jury was presented with two conflicting theories based on the expert medical testimony produced by the State and the defense. We cannot conclude that the jury lost its way simply because it chose to believe the overwhelming amount of medical evidence the State presented. The jury was not obligated to believe the testimony of Dr. Uscinski or Dr. Stephens simply because they were experts. *See Waugh v. Chakonas*, 9th Dist. Nos. 25417 & 25480,

2011-Ohio-2764, ¶ 23. This Court has conducted an extensive review of the record in this matter. Based upon our review of the record, this is not the exceptional case where the jury lost its way in choosing to believe the State's version of the events. *See Otten*, 33 Ohio App.3d at 340. Ms. Calise's convictions are not against the manifest weight of the evidence, and her eighth assignment of error is overruled.

## ASSIGNMENT OF ERROR XVII

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON LESSER-INCLUDED OFFENSES AND IN FAILING TO PROPERLY INSTRUCT ON THE ELEMENTS OF THE OFFENSES WITH WHICH MS. CALISE WAS CHARGED.

## ASSIGNMENT OF ERROR XVIII

THE TRIAL COURT ERRED IN FAILING TO GRANT AN ACQUITTAL BASED ON THESE ERRONEOUS JURY INSTRUCTIONS.

{¶67} In her seventeenth assignment of error, Ms. Calise argues that the trial court erred by refusing to instruct the jury on lesser-included offenses and by improperly instructing the jury on her indicted offenses. In her eighteenth assignment of error, she argues that the court erred by not acquitting her based on its erroneous jury instructions. We disagree with both propositions.

{¶68} A jury may consider an unindicted crime if it is a lesser-included offense or inferior degree of the crime charged. *State v. Deem*, 40 Ohio St.3d 205, 208 (1988). "An instruction on a lesser-included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense." *State v. Carter*, 89 Ohio St.3d 593, 600 (2000). This Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case. *State v. Sanders*, 9th Dist. No. 24654, 2009-Ohio-

5537, ¶ 45. An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore*, 5 Ohio St.3d at 219.

**{¶69}** Ms. Calise argues that the trial court erred by not instructing the jury on misdemeanor child endangering, an inferior degree of felony child endangering, with regard to the child endangering count (Count Four) linked to her involuntary manslaughter count (Count Two). In conjunction with that argument, Ms. Calise avers that the trial court erred by not providing a more complete definition of foreseeability. According to Ms. Calise, had the court properly instructed the jury, the jury could have determined that it was not foreseeable that her act of leaving Aaliyah alone in a bathtub would result in serious physical harm to Aaliyah. *See* R.C. 2919.22(E)(2)(c), (d); *State v. Shirey*, 9th Dist. No. 22593, 2006-Ohio-256, ¶ 18 (for an offense to constitute felony child endangering, the State must prove that serious physical harm to the child resulted from the act of endangerment).

**{¶70}** "A trial court must charge a jury with instructions that are a correct and complete statement of the law." *State v. Estright*, 9th Dist. No. 24401, 2009-Ohio-5676, ¶ 46. The trial court here instructed the jury in accordance with the Ohio Jury Instructions on Child Endangerment and causation in a homicide case. *See State v. Armstrong*, 9th Dist. No. 24479, 2009-Ohio-5941, ¶ 13 (instructions found in Ohio Jury Instructions are the recommended instructions in Ohio). Specifically, the trial court instructed the jury as follows:

> Causation. The State charges that the Defendant's commission of Endangering Children caused the death of Aaliyah Ali. Cause is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the death and without which it would not have occurred.
>
> The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act. The Defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act or failure to act.

There may be one or more causes of an event. However, if the Defendant's act or failure to act was one cause, then the existence of other causes is not a defense. The Defendant is responsible for the natural consequences of the Defendant's unlawful act or failure to act even though death was also caused by the intervening act or failure to act of another.

If the Defendant inflicted an injury not likely to produce death, and if the sole and only cause of death was a natural cause, the Defendant who inflicted the original injury is not responsible for the death.

See 4 *Ohio Jury Instructions*, Section 417.23 (2010); 4 *Ohio Jury Instructions*, Section 417.25 (2010). Ms. Calise has not set forth any argument as to why the court's causation instruction did not suffice or in what particular way the court's instruction was deficient. According to Ms. Calise, the court's instruction did not adequately convey to the jury that the end result of serious physical harm to Aaliyah, rather than merely some injury, must have been foreseeable to Ms. Calise when she acted or failed to act. The plain language of the causation instruction, however, required the jury to find that Ms. Calise caused Aaliyah's death. The court specifically instructed the jury that Ms. Calise would not be responsible for Aaliyah's death if the injury she inflicted was "not likely to produce death." The court also properly defined "recklessly" for the jury, as discussed below. As such, the jury could convict Ms. Calise only if it found that she recklessly caused Aaliyah's death. Absent a reasoned argument from Ms. Calise supported by applicable legal authority, we will not conclude that the trial court improperly instructed the jury on causation. *See* App.R. 16(A)(7).

{¶71} As to Ms. Calise's argument that the court should have instructed the jury on the inferior degree of child endangering, Ms. Calise concedes that there was evidence from which the jury could have concluded that she was guilty of felony child endangering. Indeed, the entire theory of the defense was that Aaliyah fell in the bathtub after Ms. Calise left her unattended and it was entirely possible for a child to sustain a severe head injury from such a fall. The evidence

presented at trial would not reasonably have supported an acquittal on the crime charged.  *See Carter*, 89 Ohio St.3d at 600.  *See also State v. Moss*, 9th Dist. No. 24092, 2008-Ohio-3956, ¶ 26-27.  Thus, the trial court did not abuse its discretion by refusing to instruct the jury on misdemeanor child endangering.

{¶72}  Lastly, Ms. Calise argues that the trial court erred by not providing a better definition of "recklessness" and by not instructing the jury that the mens rea for both murder and involuntary manslaughter was recklessness.  As with the other definitions that the trial court issued, the court provided the jury with the definition of recklessness contained in the Ohio Jury Instructions.  The court instructed the jury as follows:

> Recklessly.  A person acts recklessly when, with heedless indifference to the consequences, she perversely disregards a known risk that her conduct is likely to cause a certain result or to be of a certain nature.
>
> A person is reckless with respect to circumstances when with heedless indifference to the consequences she perversely disregards a known risk that such circumstances are likely to exist.
>
> Since you cannot look into the mind of another, recklessness is determined from all the facts and circumstances in evidence.  You will determine from these facts and circumstances whether the Defendant recklessly abused Aaliyah Ali causing her serious physical harm.

*See* 4 *Ohio Jury Instructions*, Section 417.17 (2010).  The court's definition also matched the statutory definition of recklessness contained in R.C. 2901.22(C).  Further, the court instructed the jury on "risk" and "substantial risk," both of which contrasted a significant or strong possibility of causing a certain result with a remote possibility of a certain result.  *See id.*  Ms. Calise has not shown that the trial court's recklessness instruction was deficient or led the jury to convict her merely because "some injury" to Aaliyah was foreseeable.  *See* App.R. 16(A)(7).  Nor has she shown that the trial court erred by not instructing the jury that recklessness was the mens rea for her felony murder or involuntary manslaughter counts.  Felony murder does not

contain a mens rea component; it is the predicate offense that contains the mens rea component for felony murder. *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 43. The same is true for involuntary manslaughter, as its degree depends upon the felony underlying it. *See, e.g., State v. Evans*, 93 Ohio App.3d 121, 126 (9th Dist.1994). The court provided a complete definition of recklessness for Ms. Calise's counts of child endangering. Thus, we conclude that the trial court did not err in instructing the jury.

{¶73} Ms. Calise's seventeenth assignment of error is overruled, as the trial court did not abuse its discretion or otherwise err by instructing the jury. Further, because the court did not issue erroneous instructions to the jury, the court also did not err by refusing to acquit Ms. Calise on the basis of any alleged erroneous instructions. Ms. Calise's eighteenth assignment of error is likewise overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL BECAUSE OF THE IMPROPER EXCLUSION OF DR. LLOYD'S TESTIMONY.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL BECAUSE OF THIS IMPROPERLY-ADMITTED EVIDENCE.

## ASSIGNMENT OF ERROR VII

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT[.]

## ASSIGNMENT OF ERROR IX

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL ON THE GROUND THAT THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## ASSIGNMENT OF ERROR X

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL ON THE BASIS OF PROSECUTORIAL MISCONDUCT.

## ASSIGNMENT OF ERROR XII

THE TRIAL (sic) ERRED IN DENYING A NEW TRIAL BECAUSE OF ITS EXCLUSION OF THIS OPINION FROM DR. STEPHENS.

## ASSIGNMENT OF ERROR XIV

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL BASED ON THE ADMISSION OF THAT TESTIMONY.

## ASSIGNMENT OF ERROR XVI

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL BECAUSE OF THE JUROR MISCONDUCT.

## ASSIGNMENT OF ERROR XIX

THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL BASED ON THE ERRONEOUS INSTRUCTIONS.

{¶74} The foregoing nine assignments of error all arise from the trial court's ruling on Ms. Calise's motion for a new trial. We conclude that Ms. Calise's motion for new trial was properly denied.

{¶75} Initially, we address the State's argument that the trial court should have denied Ms. Calise's motion for new trial on the basis that it was untimely. "Application for a new trial shall be made by motion which * * * shall be filed within fourteen days after the verdict was rendered * * * unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing [her] motion for a new trial * * *." Crim.R. 33(B). If the defendant demonstrates that filing an extension is warranted, "the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion * * *." *Id.* A trial court "may not extend the time for taking any action

under * * * Rule 33 * * * except to the extent and under the conditions stated in [the rule]." Crim.R. 45(B). "In the absence of compliance with the procedures set forth in Crim.R. 33(B), a motion for a new trial is not properly before the trial court." *State v. Hernon*, 9th Dist. Nos. 3262-M & 3267-M, 2002-Ohio-3741, ¶ 9. *Accord State v. Charlton*, 9th Dist. No. 98CA007121, 1999 WL 689895, *2 (Sept. 1, 1999).

{¶76} The jury entered its verdict against Ms. Calise on June 16, 2011. On June 28, 2011, the trial court issued an order extending the filing deadline for Ms. Calise's motion. The order provided:

> Upon motion and for good cause shown, this Court hereby ORDERS that, due to the extensive trial preparation and complexity of the issues involved in the above captioned case, the deadline for [Ms. Calise's] Motion for New Trial be extended seven (7) days. [Ms. Calise's] motion will be due no later than July 6, 2011.

Ms. Calise filed her motion for a new trial on July 6, 2011, eight days after the court issued its June 28th order extending Ms. Calise's filing deadline. In response, the State argued that the court should deny the motion as untimely because Ms. Calise had filed it beyond Crim.R. 33's seven-day timeframe. *See* Crim.R. 33(B). The court acknowledged that Ms. Calise had filed her motion eight days after its order granting an extension. Nevertheless, the court proceeded to consider the motion on its merits. In doing so, the court noted that its own order had set forth July 6, 2011, as the deadline for Ms. Calise's motion, and the interests of justice would be best served by the court's consideration of the motion. The court then denied the motion on its merits.

{¶77} We agree with the State's proposition that a motion for a new trial generally must be filed within the deadline set forth by Crim.R. 33(B). In *State v. Ross*, the Ohio Supreme Court examined the interplay between Crim.R. 29, Crim.R. 45, and their federal counterparts. *State v. Ross*, 128 Ohio St.3d 283, 2010-Ohio-6282. Much like Crim.R. 33, Crim.R. 29 contains

a deadline for the filing of a Crim.R. 29 post-verdict motion. *See* Crim.R. 29(C). It is also subject to the constraints of Crim.R. 45, which prohibits a court from extending its filing deadline in any manner other than the manner set forth in Crim.R. 29. *See* Crim.R. 45(B). The *Ross* Court examined the State's appeal from a ruling on a renewed Crim.R. 29 motion that Ross had filed beyond the rule's filing deadline. *Ross* at ¶ 34. The Supreme Court ultimately concluded that the trial court erred by considering Ross' untimely motion because it was not properly before the trial court and the State had objected to its untimeliness. *Id.* at ¶48-49. In reaching its result, the Supreme Court relied in part upon *Eberhart v. United States*, 546 U.S. 12 (2005).

{¶78} In *Eberhart*, the United State Supreme Court considered the nature of the deadline set forth in Fed.R.Crim.P. 33, the federal rule governing the filing of motions for new trial. The Court took care to note that the deadline contained in Fed.R.Crim.P. 33 is not a jurisdictional one that would bar a trial court from considering an untimely-filed motion on its merits. *Eberhart* at 17-19. Nevertheless, the Court described the rule as "a claim-processing rule [] that is admittedly inflexible because of [Former] Rule 45(b)'s[2] insistent demand for a definite end to proceedings." *Id.* at 19. The Court stated that trial courts "must observe the clear limits of the Rules of Criminal Procedure when they are properly invoked." *Id.* at 17. The Court specified that when the government objects to an untimely filed motion for a new trial the strict time limit contained in Fed.R.Crim.P. 33 "assure[s] relief." *Id.* at 19. In *Ross*, the Ohio Supreme Court

---

[2] At the time of the Court's decision, Fed.R.Crim.P. 45(b) mirrored Crim.R. 45(B) to the extent that it prohibited a trial court from extending the filing deadlines for certain enumerated rules.

favorably cited the foregoing language from *Eberhart* as it pertains to motions for new trial. *Ross* at ¶ 26, quoting *Eberhart* at 19. Therefore, the Supreme Court has recognized that a defendant must abide by Crim.R. 33(B)'s filing deadlines when filing a motion for a new trial.

**{¶79}** Even so, neither *Ross*, nor *Eberhart*, involved a miscalculation on the part of the trial court with regard to the filing deadline for a defendant's motion for new trial. Ms. Calise complied with the filing deadline the trial court set forth in its order. The problem is that the court mistakenly extended the filing deadline for one additional day past Crim.R. 33(B)'s seven-day time limit. *Ross* and *Eberhart* arise from different procedural postures than the posture at issue in this case, and we do not believe that those cases extend to this exact scenario. We agree with the trial court that the interests of justice would not be served by penalizing Ms. Calise for having filed her motion in conformance with the trial court's stated filing deadline. Thus, while we agree that a defendant generally must comply with Crim.R. 33(B)'s rigid filing deadline, we do not agree that the general rule applies in this specific instance. Ms. Calise's motion was properly before the trial court, so the court did not err by considering it.

**{¶80}** Ms. Calise sets forth nine assignments of error that stem from the trial court's denial of her motion for new trial. Yet, each of the assignments of error present issues that this Court has already addressed in analyzing Ms. Calise's other assignments of error. Ms. Calise does not set forth any separate argument in the foregoing nine assignments of error that she did not already set forth, and that this Court did not already reject, in her other assignments of error. As such, we likewise reject Ms. Calise's second, fourth, seventh, ninth, tenth, twelfth, fourteenth, sixteenth, and nineteenth assignments of error. *See Lorenzo v. Fuerst*, 9th Dist. No. 17722, 1997 WL 13666, *9 (Jan. 8, 1997).

III.

**{¶81}** Ms. Calise's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

WHITMORE, P. J.
CONCURS.

BELFANCE, J.
CONCURRING IN JUDGMENT ONLY.

{¶82} I concur in the majority's judgment because I believe that the results of Dr. Lloyd's experiment do not meet the reliability requirements of Evid.R. 702. However, my reasons for coming to this conclusion differ from those of the majority.

{¶83} Evid.R. 702 governs the admissibility of expert testimony and requires that the testimony meet all of the following requirements:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
>
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶84} There is little doubt that Dr. Lloyd qualifies as an expert of biomechanics. Dr. Lloyd holds a doctorate in ergonomics. He is also the associate director of the Research Center of Excellence and director of the Biomechanics Research Laboratory at the James A. Haley Veterans Hospital. He has published 19 peer-reviewed articles and consistently presents at national conventions on ergonomics and biomechanics.

**{¶85}** As Dr. Lloyd explained,

> [A] biomechanist has to understand anatomy and physiology. As a biomechanist I can say this amount of force would cause this kind of injury in a person of this age, height, [and] weight. What I can't say * * * because I'm not a medical doctor is this force caused this injury in this person. * * * I can say the force could cause a brain injury in a two[-]year[-]old, but I can't say it caused the brain injury in this two[-]year[-]old.

In other words, Dr. Lloyd did not intend to testify that Aaliyah fell and that caused her brain injury. Instead, he intended to testify that his research showed that, if a child of her stature slipped and fell in a bathtub, it could generate a certain amount of force and possibly cause the injury Aaliyah sustained.

**{¶86}** However, "[b]ecause even a qualified expert is capable of rendering scientifically unreliable testimony, it is imperative * * * to examine the principles and methodology that underlie an expert's opinion." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 17. Although Dr. Lloyd is certainly an expert in ergonomics and biomechanics, I cannot conclude that the trial court erred when it excluded the results of his experiment because Dr. Lloyd did not establish that they were reliable.

**{¶87}** "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611 (1998), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-594 (1993). The focus must be on whether the expert's opinion is based "upon scientifically valid principles[.]" *Miller* at paragraph one of the syllabus. Dr. Lloyd's experiment purported to demonstrate that, should an infant fall in a bathtub, the fall could create enough force to cause the injuries sustained by Aaliyah. To that end, Dr. Lloyd ran 25 tests, dropping a CRABI1

mannequin, the type of mannequin typically used in safety-testing for automobiles, of similar size and weight to Aaliyah from three different positions around the bathtub to see what force generated from the impact of its head on the tub. He then compared the force generated by the falls to injury thresholds that have been developed from over 40 years of automotive-crash-testing. He asserted that his results were conservative estimates of the force generated. In other words, he claimed that any discrepancies between his experiment and the conditions where Aaliyah potentially fell served to reduce the impact recorded in the experiment and, therefore, if Aaliyah fell, the force from the impact would have been *at least* as great as those recorded in his experiment.

**{¶88}** However, Dr. Lloyd did not conduct any control experiments nor did he point to any studies that would support his assertion that his results were conservative. For example, he stated that he "would have expected the results to be at least the same if not greater[]" if the bathtub were made of a different material or installed in a different manner. In other words, Dr. Lloyd's presumption that his results were conservative was conjecture beyond the data available to him. For this reason, Dr. Lloyd's potential testimony cannot be said to have been reliable because it was based upon assumptions that were not confirmed through scientific testing. *See Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 21 (affirming a trial court's finding that experts failed to adequately explain the scientific basis for their conclusions that required extrapolation from the underlying materials).

**{¶89}** However, while I agree that the trial court correctly excluded the report, I disagree with the majority that Dr. Lloyd failed to establish the reliability of his methods. The majority concludes that the report is unreliable because Dr. Lloyd did not point to any other experiments "comparable" to his experiment. However, as Dr. Lloyd pointed out, this general methodology

essentially has been done to study effects of automobile collisions for more than 40 years. Furthermore, he testified that he used roller skates to simulate slips in his research for the Veterans Hospital and also gave two examples of experiments using the type of mannequin that he used to measure impact from falls. The first example was an experiment by a colleague that recreated an infant's fall from play equipment in the infant's garage. The second example was Dr. Lloyd and another researcher dropping mannequins out of beds of different heights from different angles onto different surfaces to measure the forces of the resulting impacts. The majority seems to believe that these examples are not comparable enough because one was a precise recreation of a specific fall while the other dealt with falls from a bed onto the floor. However, the fact that the play-equipment test was a recreation of an exact fall is irrelevant to whether the methodology was comparable. The researchers in that test used the same type of mannequin as Dr. Lloyd to determine what the impact would be if an infant were to fall from the equipment onto a garage floor. Similarly, in the second example, Dr. Lloyd used a mannequin to measure the impact sustained by an adult who fell out of bed. In other words, it was essentially the same as the experiment conducted for this case, albeit with an adult-sized mannequin and no bathtub. While neither of the experiments were exactly the same as the one conducted by Dr. Lloyd in this case, they did both use the same general methodology.

{¶90} Thus, unlike the majority I believe these studies are comparable to the experiment performed in this case in that the use of a mannequin and the simulation of a slip and fall can provide data concerning the amount of force generated from a fall. Essentially, Dr. Lloyd testified that the type of mannequin that he used to simulate Aaliyah's potential fall is used in many studies to measure the force resulting from an impact. The fact that Dr. Lloyd used the mannequin to measure the force of a fall in a bathtub as opposed to a fall from a bed, a fall from

play equipment, or from an automobile crash is inconsequential to the question of whether his methodology is widely accepted by other experts in his field. The techniques he used to measure the force from a fall *are* widely accepted by others in his field. Furthermore, the principles of mathematics and physics underlying the calculations of force are well established. To accept the general theories and methods in Dr. Lloyd's experiment would hardly be an example of the law leading science but rather accepting principles accepted by experts for many, many years.

{¶91} I also disagree with the suggestion that a prerequisite to the admission of Dr. Lloyd's findings was that he demonstrate a precise recreation of the conditions in the bathtub. "When an out-of-court experiment is not represented to be a reenactment of the accident and deals with one aspect or principle directly related to the cause or result of the occurrence, the conditions of the accident need not be duplicated." *Miller*, 80 Ohio St.3d at paragraph two of the syllabus. Here, Dr. Lloyd did not suggest that he had constructed a precise recreation of the accident scene; instead, he employed both established techniques and scientific principles from which he could measure the degree of force generated by a fall in a bathtub.

{¶92} Thus, I would conclude Dr. Lloyd's proposed testimony did not meet the reliability standards of Evid.R. 702 but not because he used unsound techniques or theories or because he did not recreate the precise scene of the fall. Instead, Dr. Lloyd lacked a scientific basis for concluding that the results of his experiment were conservative, *see Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 21, because he did not conduct more extensive experimentation to thoroughly test some of the assumptions underlying his experiment in this case (e.g. the fact that the force from the impacts he measured was at the low end of the potential forces generated from slipping and falling in a bathtub). While it is understandable that Dr.

Lloyd did not conduct a more thorough experiment given the timeline he operated under in this case, his report still failed to meet the requirements of Evid.R. 702.

{¶93} With respect to Ms. Calise's fourth assignment of error, Ms. Calise frames her argument in terms of prosecutorial misconduct, arguing that the State had failed to disclose exculpatory information during discovery. However, this claim is not supported by the record, and, thus, I would overrule the assignment of error on that basis.

{¶94} Accordingly, I concur in the judgment.


APPEARANCES:

DONALD J. MALARCIK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.